Counsel of Record:
Andrew M. Calamari
Sanjay Wadhwa
Michael D. Paley
Nancy A. Brown
Yitzchok Klug
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **15 Civ.      (    )** |
| | : | |
| - against - | : | **ECF Case** |
| | : | |
| **NORSTRA ENERGY INC., GLEN LANDRY** | : | **COMPLAINT** |
| **and ERIC DANY,** | : | |
| | : | |
| **Defendants.** | : | |

-------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendants Norstra Energy Inc. ("Norstra" or the "Company"), Glen Landry ("Landry"), and Eric Dany ("Dany"), alleges as follows:

## SUMMARY

1.      From March 2013 to the present, Landry, the President and CEO of Norstra, has made numerous materially false and misleading statements about Norstra's oil reserves, drilling plans, and business prospects. These statements, for which Landry was solely responsible, appeared in numerous Norstra press releases and on its website, as well as in Commission filings that Landry signed.

2.      From April through June 2013, Dany, a stock-picking newsletter writer, made materially false and misleading statements of his own about Norstra's projected business prospects in spam e-mails and hard-copy mailers he was paid to endorse.  Those materials touted Dany's enthusiastic predictions of Norstra's business prospects that were both objectively and subjectively false.

3.      Norstra's stock price and volume increased substantially following the Defendants' false and misleading statements in the Spring of 2013, going from $0.35 per share on March 5, 2013 to $2.06 a share on June 6, 2013.  On June 26, 2013, the Commission issued an Order suspending trading in shares of Norstra.

4.      By engaging in the conduct set forth in this Complaint, the Defendants violated (and unless permanently enjoined, will continue to violate) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5(b) thereunder.  In addition, Landry aided and abetted Norstra's violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

5.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment:  (a) permanently enjoining the Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Defendants to disgorge ill-gotten gains and to pay prejudgment interest thereon; (c) prohibiting Defendant Landry, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from acting as an officer or director of any public company; (d) prohibiting Defendant Landry, pursuant to Section 21(d)(6)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(6)(A), from participating in an offering of penny stock; and (e) imposing civil money

penalties on Defendants pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

7.     Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Some of the transactions, acts, practices and courses of business occurred in the Southern District of New York and some of the victims reside here.

## DEFENDANTS

8.     **Norstra** is a Nevada corporation, purportedly engaged in the business of oil exploration, drilling and extraction.  Its stated principal place of business is in Southlake, Texas, but its leasehold interests are in northwest Montana.  Norstra was incorporated in 2010.  Until trading in Norstra securities was suspended by the Commission on June 26, 2013, Norstra was quoted on OTC Link and was a penny stock as defined under Exchange Act Rule 3a51-1.

9.     **Glen Landry,** age 65, resides in Spokane, Washington.  On March 1, 2013, Landry became Norstra's President, CEO, Secretary, Treasurer and Director.  Landry has almost 40 years of experience as a geologist.

10.     **Eric Dany**, age 68, resides in Moline, Illinois.  Dany was the paid spokesperson or "endorser" for the Norstra promotional campaign.  Dany was also the editor and publisher of "Eric Dany's Stock Prospector" (the "Stock Prospector"), and "Eric Dany's Mutual Fund

Prospector," both monthly subscription stock-picking newsletters that have recently been discontinued.

## FACTS

I.  **Norstra and Landry**

    A.  **Background**

      11.   According to its various Commission filings, Norstra is "engaged in the exploration and development of oil and gas properties." By the Spring of 2013, Norstra's principal assets were leases on acreage located in Lewis and Clark County in northwestern Montana.

      12.   After he was named CEO and President of Norstra on March 1, 2013, Landry reviewed and signed all of Norstra's filings with the Commission and was solely responsible for Norstra's website content and all of its press releases. Pursuant to the terms of his contract with the Company, Landry was paid $5,000 per month in consulting fees and received 1 million shares of Norstra preferred stock, potentially convertible into 10 million shares of Norstra common stock.

    B.  **Landry's Undisclosed Interest in Norstra's Leases and Surrounding Acreage**

      13.   Prior to Landry's arrival at Norstra, the Company's only asset was an oil and gas interest in 40 acres in Reno County, Kansas, which Norstra had acquired in 2011 for $15,000.

      14.   Less than two weeks after Landry was named Norstra CEO, Norstra announced, in a March 18, 2013 press release and a Form 8-K, signed by Landry on March 15, 2013 and filed with the Commission on March 18, 2013, that it had entered into a contract by which

Norstra acquired interests in 10,000 acres of Montana oil leases through a farmout agreement with the leaseholder, Summit West Oil LLC ("Summit West").[1]

15.    Summit West had been formed in 2011 by a close business associate of Landry (the "Summit West Officer").  Although Landry held no official position at Summit West, account opening documents for a Summit West bank account list Landry as both managing member and signatory.

16.    In neither the press release, nor the Form 8-K, did Landry disclose the close relationship between him and Summit West.  The press release failed to disclose that it was Landry who had directed Summit West to acquire that acreage in the months prior to his arrival at Norstra, and that it was Landry who had lent the funds to Summit West that it had used to make the acquisition.

17.    Landry and Norstra also did not disclose that the terms of the farmout agreement between Norstra and Summit West had been dictated by Landry or that the Summit West Officer had not even been made aware of the agreement until he read about it in Norstra's press release. In fact, because no agreement had been consummated at the time of Norstra's public announcement of it on March 18, 2013, the Summit West Officer later executed a version of the farmout agreement that was back-dated to March 12, 2013.

18.    Nor did Landry disclose – then or since – that he also owned interests in thousands of acres of oil leases surrounding Norstra's leaseholdings, either through companies he controls or through Summit West.  As Landry himself acknowledged in an email with a

---

[1]    A "farmout agreement" is a contract whereby the owner of a working interest in an oil and gas lease assigns all or part of that interest to another party in exchange for the other party fulfilling contractually specified conditions, typically relating to drilling a well within a certain time frame.  The assignor of the interest typically reserves a specified overriding royalty interest in the lease.

prospective joint venture partner, his interests in neighboring lands stood to gain in value from Norstra's drilling activities; if Norstra's drilling generated interest from other oil companies, land values surrounding the prospect would increase.

19.     In fact, soon after Landry negotiated a farmout agreement of some of Norstra's acreage in early 2014 with a publicly-traded Canadian oil company, Landry entered into a separate agreement with that company to sell interests that he controlled in land contiguous to the east and south of Norstra's in exchange for the Canadian company's stock and warrants. Landry and Norstra made no disclosure of this separate agreement.

C.     **Misrepresentations About Norstra's Reserves**

20.     On June 3, 2013, Landry and Norstra announced in a press release that Norstra had received a reserve report (the "Reserve Report") for its leased acreage– the South Sun River Bakken Prospect – from its geologist (the "Geologist") confirming that each of Norstra's leased "sections" (a unit of land equivalent to 640 acres or a square mile) contained "between 9.5 and 16.7 million barrels" of "original oil in place" or OOIP.  OOIP is an industry term of art and refers to the volume of oil, in barrels, in a reservoir prior to production.  As Landry knew, or was reckless in not knowing, it is a different number from, and significantly greater than, the amount of oil ultimately recoverable.  The Reserve Report and press release were attached as exhibits to a Form 8-K that Norstra filed that same day and were also posted on Norstra's website.

21.     The Reserve Report was materially misleading.  Nowhere in the Reserve Report (or the press release or Form 8-K) did Norstra or Landry disclose the difference between recoverable oil and original oil in place (OOIP)  --  an important distinction with which potential investors were not familiar --  and that the actual number of barrels of oil Norstra could recover would be significantly lower than the 9.5 to 16.7 million barrels of oil that the Reserve Report

estimated.  Nor did Norstra or Landry disclose that the Reserve Report estimates relied on the

Geologist's assumptions about positive geological conditions, such as low water saturation,

optimal formation pressure and the absence of underground faults.  If any of those assumptions

proved wrong, the OOIP estimate, and ultimately, the quantity of recoverable oil would be

significantly and negatively impacted.  . In estimating OOIP, the Geologist had assumed that in

drilling the wells, Norstra would discover that the geological variables, such as water saturation,

formation pressure and the presence of underground faults, would all be favorable to Norstra's

drilling success.

22.     The Geologist never intended for his Reserve Report to be publicly disseminated

or issued to anyone other than trained geologists; he had accepted Landry's limited assignment to

perform what Landry called "some rough calculations" of OOIP.

23.     Landry knew, or was reckless in not knowing, that the Reserve Report's estimate

of OOIP, as well as the amount of oil actually recoverable, depended on the existence of the

favorable geological conditions that were unknowable until Landry and Norstra started to drill,

but which the Geologist had assumed would be favorable to Norstra in making his estimates.

24.     When the Geologist became aware that Landry and Norstra had disseminated his

report to the general public, he revised the report to include disclaimers explaining the variables

that had not been factored into his estimates and the difference between OOIP and recoverable

reserve estimates.  He attached the updated report to an email that he sent Landry on August 9,

2013 and asked that Landry replace the earlier report with this revised one.  Landry did not

respond to the email, and as of July 2, 2014, the original report was still displayed on Norstra's

website.

25.     In November 2013, the Geologist discovered that his Norstra Reserve Report also contained erroneous data that affected his calculation of OOIP, resulting in a significant decrease to those estimates.  The Geologist had based his OOIP estimates, at least in part, on well log data from two older, or "model," wells drilled in the area, which provided him with measures of porosity.  For geologists, higher porosity percentages noted on a well log correspond with a higher probability of oil presence.  However, in reviewing his logs, the Geologist realized that the porosity percentage he cited in the Reserve Report for one of the model wells was only 4-6% and not the 12% he had used.   When he recalculated the estimates with the accurate data, his per section OOIP estimate of between 9.5 and 16.7 million barrels on Norstra's property dropped to between 3.2 and 13.9 million barrels OOIP.

26.     The Geologist notified Landry of his error, and on March 17, 2014, he attached the newly revised report to an email he sent Landry.  In the email, the Geologist called attention to the revisions and wrote:  "I recently also became aware that you posted my report on Norstra's website.  I hope that you will replace that report with this corrected one, attached."  Landry responded and assured the Geologist that he would "get the website corrected."  But six months later, the Reserve Report as originally posted in June 2013 remained featured on Norstra's website.

27.     Even before he posted the Reserve Report to Norstra's website in June 2013 (and even before the Geologist, himself, realized his error), Landry knew or was reckless in not knowing that the Geologist had used the wrong data in the Reserve Report.  In a May 20, 2013 Norstra press release, Landry quoted the correct data in a discussion of the same older wells that the Geologist had used in determining his OOIP estimates.   And when he saw the Geologist's Reserve Report with the incorrect data, as a trained geologist with almost 40 years' experience,

Landry knew or was reckless in not knowing that the Geologist had used erroneous data and that the Reserve Report estimates were inflated accordingly.

**D.   Misleading Claims About Norstra's Drilling Plans and Location of Its Prospect**

28.     In an effort to build interest in Norstra and to create the appearance that Norstra was moving quickly to begin drilling operations, Landry and Norstra filed a Form 8-K on March 18, 2013 to announce Norstra's plans to drill a "horizontal well at an estimated expenditure of $5,000,000" by June 30, 2013.  But Norstra had no such plans, as Landry knew; instead Landry's and Norstra's drilling plans did not call for drilling a well until December 31, 2013 at the earliest.  Landry subsequently explained that the June 30, 2013 date in the March press release had been a "typo" that he corrected with a later press release.

29.     But Landry and Norstra repeated that "typo" in another public announcement and Commission filing, nearly two months later.  In its Form 10-K, filed with the Commission on June 7, 2013 – a filing Landry reviewed prior to its submission to the Commission and signed as Norstra's CEO – Norstra claimed once again that its drilling plans were on track to start by June 30, 2013.  Landry knew that the June 30, 2013 date was wrong, and he intentionally or recklessly disseminated it to the public, not once, but twice.

30.     Landry provided similarly inaccurate data to the Geologist for use in his Reserve Report that Landry and Norstra released and furnished to the Commission in the June 3, 2013 Form 8-K.  In a map provided to the Geologist by another consulting geologist working for Landry, Norstra's prospect was depicted as consisting of acreage that Norstra did not even control.  Because the Reserve Report highlighted the proximity of Norstra's prospect to two model wells from which promising data had been extracted, and the Geologist used those wells'

data in the estimates he calculated, the prospect's precise location was important to investors in assessing Norstra's prospects.

31.     In contrast to what was depicted in the map, Norstra's prospect was not merely one or two miles away from the model wells and concentrated in just one area.  Instead, Norstra's leases were scattered over a much larger area, with some of them being as far as 15-20 miles away from the model wells.  Landry directed the acquisition of Norstra's leases, and reviewed the Geologist's Reserve Report before he issued it in Norstra's June 3, 2013 press release.  Therefore, Landry knew or was reckless in not knowing that the Reserve Report's map included false and misleading information about the prospect's location.

**E.     Misrepresentations About the USGS Bakken Reserve Estimates**

32.     Landry and Norstra made additional false statements in Norstra's June 7, 2013 Form 10-K, all of which were designed to instill investor confidence in the Company's ability to find and produce oil.  In that filing, Norstra and Landry intentionally or recklessly misrepresented official U.S. Government estimates of oil reserves in the Bakken Formation – the region in which Norstra claimed its oil leases were located – inflating them by many multiples of the actual, official estimates.

33.     In the June Form 10-K (and in three presentations Norstra and Landry posted to the Norstra website, and at least one press release), Norstra and Landry wrote:  "The U.S. Geological Survey (USGS) has called the Bakken Formation the largest continuous oil accumulation it has ever assessed [sic] as much as 500 billion barrels of oil sitting untapped beneath Montana, North Dakota [sic] a potential supply of oil four times as large as that held in Saudi Arabia's massive Ghawar region."

34.     But the USGS never published any such estimates.  In fact, the official USGS Survey – available at all times on the USGS website – put estimates for the Bakken Formation at 3.65 billion barrels of original oil in place, or a fraction of the 500 billion barrels of oil Norstra and Landry claimed.  And in its April 2013 revised official Survey of the Bakken – which Landry reviewed soon after its release – the USGS raised those estimates to 7.4 billion barrels of original oil in place, but still nowhere near the 500 billion Landry and Norstra cited as USGS estimates in Norstra's subsequently filed June 2013 Form 10-K.

35.     Also in the June Form 10-K were Norstra's and Landry's intentional or reckless misstatements about reserve estimates that the Energy Information Administration ("EIA") had published.  In that filing, Norstra and Landry cited the EIA as estimating that the Bakken Formation held "271-503 billion barrels of original oil in place."

36.     But Landry and Norstra omitted from the Form 10-K the key facts that made these statements materially misleading:  the EIA never published its own estimates of oil reserves in the Bakken resource at all; rather the EIA simply cited numbers found in a draft report authored by a deceased USGS geologist over a decade earlier.  In addition, the EIA report in which the draft estimates appeared (and on which Landry claimed to rely) went on to caution that the numbers were potentially unreliable, pointing out that they had never "receive[d] a complete scientific peer review by the USGS and [were] not published as a USGS product."

37.     Landry knew or was reckless in not knowing that the USGS had never officially assessed the Bakken Formation reserves at anywhere near 500 billion barrels of oil.  Likewise, he knew or was reckless in not knowing that the EIA had never published its own estimates, and that the estimates the EIA quoted were based on a draft report that had never been scientifically reviewed.

## II.   <u>Dany</u>

### A.   <u>Background</u>

38.    As publisher and author of monthly financial newsletters, sold by subscription, Dany proclaims that his "forte is being early to dig up the next big winner in the natural resources sector."  In addition to publishing his monthly newsletter, Dany also occasionally contracts to promote certain stocks.

39.    Dany first began promoting Norstra in April 2013 in an e-mail sent via a blast spam campaign (the "E-Mailer"), a campaign that continued through early June 2013.  In mid-to late May through June 2013, Dany also promoted Norstra through a sixteen page hard-copy color mailer (the "Mailer"), which was mailed to approximately 2.5 million potential investors, including investors residing in this District.  (The E-Mailer and the Mailer are collectively referred to as the "Promotional Materials.")

40.    Dany was retained as endorser for the Promotional Materials by an advertising company based in Florida that specializes in providing promotional services for publicly traded companies (the "Advertising Company").  The Advertising Company itself had been retained by an off-shore entity that disclaimed any ownership in or connection to Norstra.  Dany received $10,000 for his endorsement of the E-Mailer and an additional $10,000 for his endorsement of the Mailer from the Advertising Company.

41.    In March 2013, the Advertising Company hired a copy writer (the "Copy Writer") to draft the Promotional Materials.  In April 2013, after retaining Dany as the official endorser, the Advertising Company put the Copy Writer in touch with Dany so that Dany could review and approve the Promotional Materials that would bear his name.

**B.**   **Dany Reviewed and Approved the Promotional Materials**

42.   Dany reviewed and approved both the E-Mailer and the Mailer that were emailed or mailed to potential investors from April through mid-June 2013.  Dany had final approval over the Promotional Materials, and the "Investor Relations Project Agreement" between Dany and the Advertising Company concerning the e-mail campaign provided that "Eric Dany maintains the right of final approval of all copy and design."

43.   Dany and the Copy Writer spoke by phone more than once during the months of March and April to review the Promotional Materials.  At Dany's request, the Copy Writer supplied him with documentary support for some of the statements in the Promotional Materials, and directed Dany to various other websites for support of others.  Dany, himself, visited various websites and consulted news articles and other materials in his review and approval of the Promotional Materials.

44.   As approved by Dany, the Promotional Materials recommended that investors purchase Norstra based on Dany's wildly optimistic projections about Norstra's future prospects. The Promotional Materials also contained a lengthy boilerplate disclaimer located at the end of the material in small print.  The disclaimer claimed, among other things, that the information in the Mailer was obtained from Norstra and other publicly available sources, but warned that Dany had not verified any statement, and that he "does not perform any due diligence on the stocks and companies discussed."

45.   Dany knew that that disclaimer was misleading because he did in fact attempt to verify statements contained in the Promotional Materials and did in fact perform his own research, including a review in March of the USGS website.  Moreover, Dany held himself out in

the Promotional Materials as an oil and gas expert, able to pick "the next big winner in the natural resources sector," and pointing to his past successful picks in the oil and gas sector as support for that claim.

46.      In the Promotional Materials, Dany made three materially false and misleading claims.  First, both the E-Mailer and the Mailer proclaim that "Norstra Energy could be sitting on top of as much as 8.5 billion barrels of oil!"  That claim was baseless and was not one that Dany actually believed.  In describing how he arrived at the 8.5 billion number, Dany has claimed that he used a complicated mathematical formula that relied on two undisclosed assumptions, neither of which had a basis in fact.  First, he assumed that Norstra's own estimated oil reserves per section should be increased by 300 per cent.  And second, he assumed that Norstra's intentions to acquire 10 times the acreage that it currently held would be realized.

47.      In any event, neither undisclosed assumption supported Dany's claim that Norstra's currently-owned "10,097 acres could hold as much a [sic] 8.5 billion barrels of original oil in place."  Because, by his own admission, Dany's 8.5 billion estimate relied on Norstra's acquisition of additional acreage it did not yet own, Dany could not have believed that its current acreage held that much.

48.      Dany's Promotional Materials also claimed that wells drilled in the Bakken Formation enjoyed a 99% chance of profitability.  Under a heading in the Mailer, titled "6 Convincing Reasons to Load Up on NORX Now While You Can Still Get It at Around 60-cents a Share," Number 4 read:  "SUCCESS RATE – 99% of all new wells drilled in the Bakken are profitable."  While several news articles Dany reviewed reported a 99% rate of success in drilling Bakken wells, none claimed that 99% of Bakken wells drilled would be profitable.  In fact, an article Dany reviewed assigned a much lower chance of profitability to Bakken wells.

49.     Finally, all of the Promotional Materials warned investors that they should act quickly to invest in Norstra before the USGS issued its anticipated updated survey on Bakken oil estimates, a survey that Dany predicted would revise Bakken estimates much higher -- "a 458% increase" -- and create an investor rush to oil drilling stocks, pushing their stock prices to new highs.  The Mailer proclaimed on its front cover:  "Soon-to-be-released Bakken Shale Report from the United States Geological Survey could signal . . . AMERICA'S ENERGY INDEPENDENCE!" and warned:  "You need to act now before the government releases new, much higher estimates!"  (Emphasis in original.)

50.     In fact, the USGS updated assessment of the Bakken, released April 30, 2013, did raise the 2008 estimates for the region, but not by five-fold, as the Promotional Materials suggested it would, but by little more than two-fold, from 3.6 billion barrels of oil to 7.4 billion barrels for the entire region.  Nonetheless, the Mailer Dany approved on May 17, 2013, ignored the actual updated survey, and its results, and continued to claim that the "Game-Changing USGS Report Could Signal . . . as much as 100 billion barrels of original oil in place."

51.     News of the USGS update was widespread in the days following its release, and, as a self-proclaimed expert in oil and gas stocks, Dany either knew that the USGS Survey had been released and that it did not contain the lofty estimates he anticipated or he recklessly ignored the release and approved the Mailer on May 17, 2013 anyway.

C.     **The Impact of the Promotional Materials**

52.     The Promotional Materials had an impact on the market for the Norstra shares.  Norstra's stock began trading on March 5, 2013 at $.35 and reached a high of $2.06 on June 6, 2013.  From that date through June 20, 2013, over 93 million shares changed hands.  On June 6,

2013 alone, the volume was 12 million shares, representing more than 31% of the Company's outstanding shares.

53.    Norstra investors received and read the Promotional Materials and bought Norstra's stock based on Dany's positive claims about the Company.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (All Defendants)

54.    The Commission repeats and realleges paragraphs 1 through 53 of its Complaint.

55.    By virtue of the foregoing, the Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.    By virtue of the foregoing, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), promulgated thereunder.

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Norstra's Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(b) Thereunder
### (Landry)

57.    The Commission repeats and realleges paragraphs 1 through 53 of its Complaint.

58.    By virtue of the foregoing, Defendant Landry, provided knowing or reckless substantial assistance to Norstra, which, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, to make untrue statements of material

fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     By virtue of the foregoing, Landry aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), promulgated thereunder, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b);

### II.

Directing each of the Defendants Landry and Dany to disgorge all ill-gotten gains, including prejudgment interest thereon;

### III.

Permanently barring Defendant Landry from serving as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## IV.

Prohibiting Defendant Landry from participating in an offering of penny stock pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)];

## V.

Directing the Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## VI.

Granting such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
       June 18, 2015

SECURITIES AND EXCHANGE COMMISSION

By: _____
       Andrew M. Calamari
       Regional Director

       Sanjay Wadhwa
       Michael D. Paley
       Nancy A. Brown
       Yitzchok Klug
       200 Vesey Street, Suite 400
       New York, New York 10281-1022
       (212) 336-1023 (Brown)
       Email: BrownN@sec.gov

       Attorneys for Plaintiff