USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11 - 10 - 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SECURITIES AND EXCHANGE COMMISSION, :

              Plaintiff,          :

          -against-          :

CALEDONIAN BANK LTD., *et al.*,      :

            Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

15cv894

OPINION & ORDER

WILLIAM H. PAULEY III, District Judge:

        The Securities and Exchange Commission ("SEC") brings this action alleging

violations of Section 5 of the Securities Act of 1933 (the "Securities Act") and seeking

disgorgement from defendants Caledonian Bank Ltd., Caledonian Securities Ltd. (together

"Caledonian"), Clear Water Securities, Inc. ("Clear Water"), Legacy Global Markets S.A.

("Legacy Global"), and Verdmont Capital, S.A. ("Verdmont").  Verdmont moves for judgment

on the pleadings under Federal Rule of Civil Procedure 12(c) or in the alternative, seeks to

convert its motion to one for summary judgment.  For the following reasons, Verdmont's motion

for judgment on the pleadings is denied and this Court declines to convert the motion to one for

summary judgment.

        This motion comes in the aftermath of a preemptive strike by the SEC in which it

obtained an ex parte restraining order freezing funds in the Defendants' U.S. accounts.  That

freeze order, enforced against certain of Defendants' accounts, precipitated significant collateral

damage, including the collapse of a Cayman Islands financial institution.  In hindsight, that

denouement may have been avoided.  But bureaucratic siloing and missed opportunities made it inevitable.  This case offers fertile ground for agency self-examination.

BACKGROUND

I.   The SEC's Ex Parte Application

On Friday, February 6, 2015, the SEC sought a temporary restraining order ex parte freezing the U.S. assets of Caledonian (a bank and broker-dealer in the Cayman Islands), Clear Water (a broker-dealer in Belize), Legacy Global (a broker-dealer in Belize), and Verdmont (a broker-dealer in Panama).  At that time, the SEC presented the Complaint, a memorandum of law, and four declarations describing a seemingly thorough investigation, accompanied by a 676-page appendix of exhibits.

According to the Complaint, Defendants sold large swathes of worthless penny stocks—Swingplane, Goff, Norstra, and Xumanii securities—to innocent investors in the public markets without filing the registration statements required under Section 5.  The sales occurred in multiple pump-and-dump campaigns.[1]  The SEC alleged that even though the issuers had little or no assets and no revenues, Defendants managed to obtain tens of millions of dollars from their stock sales.

The clear import of the SEC's representations was that Caledonian, Verdmont, and the other defendants owned the securities, sold them to the public, and lined their pockets with the proceeds.  The Complaint minced no words: for example, "Verdmont sold all of its 14,000,000 shares [of Goff] for proceeds of $3,526,354."  (Compl. ¶ 58.)  Similarly, in a declaration in support of the ex parte application, the SEC's Market Surveillance Specialist

---

[1] While the Complaint alleges aggressive and fraudulent stock promotions, it pleads neither Securities Act Section 17(a) nor Exchange Act Rule 10b-5 violations against these defendants.

bolstered those allegations with specifics: "In total, I calculated that Caledonian, Legacy Global, Clear Water, and Verdmont obtained proceeds of $17,907,546.50 from their sales of 95,750,000 shares of Goff stock . . . ." (Declaration of Robert W. Nesbitt dated February 5, 2015 ¶ 16 (ECF No. 80).) And under questioning by this Court during the ex parte hearing, the SEC was emphatic: "The defendants that we're suing are the actual sellers of the stocks into the markets. . . . These entities sold the stocks directly to American investors and made tens of millions of dollars selling the stock." (Transcript of February 6, 2015 Ex Parte Hearing 3:5–10 (ECF No. 52).)

Adding to the urgency and need for secrecy, the SEC identified recent transfers of funds by Caledonian and Verdmont from certain of their U.S. accounts. (See generally SEC Rule 6.1 Certification of the Need to File Application Ex Parte (ECF No. 73); Declaration of Ernesto G. Amparo (ECF No. 77).) For example, the SEC explained that Verdmont recently "liquidated an account that had approximately $37 million in it of securities." (Feb. 6 Tr. 4:4–5.) And approximately half of that amount was "transferred to foreign entities." (Feb. 6 Tr. 4:7–8.) The SEC identified U.S. accounts holding over $71 million for Caledonian and over $17 million for Verdmont, which it sought to freeze.[2]

Based on these unqualified representations, this Court granted the SEC's application to freeze Defendants' assets mid-day on Friday, February 6, and directed the filing and service of the restraining order and pleadings on Defendants. (See Feb. 6 Tr. 7–9;

---

[2] Specifically, the three accounts against which the SEC sought to enforce the freeze order included: Verdmont's account at Interactive Brokers, which had $17,745,515 as of January 31, 2015; Caledonian's account at Northern Trust, which had a balance of $71,638,622.94 as of December 8, 2014; and Legacy Global's account at Scottsdale Capital Advisors, which had a balance of $59,405.94 as of November 28, 2014. (See Feb. 6 Tr. 6–7; Amparo Decl. ¶ 2, 6, 9.) But the SEC claims it never froze the assets of Legacy Global or Clear Water. (Transcript of May 21, 2015 Conference, 3:16–17 (ECF No. 95).) Last week, the SEC moved for default judgments against those two defendants. (ECF No. 138–39.)

3

Temporary Restraining Order ("TRO") (ECF No. 6).)  Within hours, the SEC froze assets in Caledonian's account at Northern Trust and Verdmont's account at Interactive Brokers.

II.  Implementation of the Asset Freeze

As soon as Caledonian and Verdmont learned of the asset freeze, their counsel began negotiating with the SEC.[3]  (See Declaration of Gerald W. Hodgkins dated May 28, 2015 ¶ 28 (ECF No. 91).)  On Friday evening, Verdmont's counsel contacted Chambers and arrangements were put in place in the event the parties desired judicial intervention over the weekend.  As early as Saturday, February 7, counsel for Caledonian and Verdmont informed the SEC separately that each defendant had acted as a broker, not a principal, in the transactions. (See Declaration of Richard E. Simpson dated May 28, 2015 ¶¶ 6–7 (ECF No. 92).) Nevertheless, the SEC maintained that it was entitled to hold onto assets equivalent to the tens of millions of dollars in sale proceeds of Caledonian and Verdmont's clients plus a civil penalty. (Simpson Decl. ¶¶ 6–7.)  That would have been a reasoned position for the SEC to take if the Commission had evidence that Caledonian and Verdmont knew of the multiple pump-and-dump campaigns or otherwise facilitated the fraud.

By Sunday, February 8, the parties agreed to modify the asset freeze order and obtained approval from the Part I Judge.  This modification lifted the "asset freeze" and required Caledonian and Verdmont to maintain minimum balances of approximately $76 million and $19 million, respectively, in certain U.S. accounts.  (See Stipulated and Consented Modifications to the TRO (ECF No. 5).)  This agreement was reached despite vigorous protestations to the SEC by Defendants that they were brokers, not principals, who had only received commissions, not

---

[3] The SEC did not serve Defendants with all of their ex parte motion papers until February 11, claiming they were "too voluminous to scan and email."  (SEC's Certification of Service ¶ 9 (ECF No. 24).)  And despite prodding from Chambers, the SEC failed to docket its motion papers until it was ordered to do so in March.  See March 27, 2015 Order (ECF No. 71); see also ECF Nos. 72–80 (entries containing TRO motion papers).

the tens of millions in proceeds alleged in the Complaint.  Caledonian and Verdmont agreed

separately with the SEC to maintain minimum account balances apparently far in excess of their

capital.  In Caledonian's case, the $76 million sum exceeded Caledonian's capital by a factor of

three.  (See Hodgkins Decl. ¶ 31.)  In Verdmont's case, the $19 million minimum balance

impaired its capital requirements by $17.5 million.  (See Simpson Decl. ¶ 17.)

News of the SEC's allegations spread quickly over the weekend, and panic

ensued among depositors and investors.  On Monday, February 9, less than 24 hours after it had

agreed to a $76 million asset freeze, Caledonian sought to renegotiate with the SEC to satisfy the

withdrawal demands of its clients.  (See Hodgkins Decl. ¶ 32, 34.)  The parties sought approval

of another modification of their stipulated agreement regarding minimum account balances.

During a teleconference with this Court, Caledonian's counsel reported that

Caledonian was experiencing a run on the bank.  The stipulated agreement permitted Caledonian

to substitute $66 million in securities for $66 million in cash as part of the total of $76 million it

agreed to maintain.  Surprisingly, neither the SEC nor Caledonian disclosed to whom these

securities and monies belonged.  But during the teleconference, counsel for Caledonian

announced that she had just been notified that Caledonian had suspended its banking operations.

Despite that startling development, Caledonian's counsel asserted: "[n]onetheless, we would still

request that this modified order be put into place."  (Transcript of February 9, 2015

Teleconference 7:8–14 (ECF No. 34).)  This Court approved the parties' agreement.  (Order

Granting Application to Modify TRO (ECF No. 4).)

Later Monday, Caledonian approached the SEC with a renewed sense of exigency

and presented the agency with a report on its dire financial condition.  Caledonian explained that,

without a settlement in the next 24 hours, the bank was headed for liquidation.  (Hodgkins Decl. ¶¶ 38–39.)

The next day, Tuesday, February 10, Caledonian again pleaded with the SEC for relief.  (Hodgkins Decl. ¶ 40.)  The SEC was unfazed: it rejected Caledonian's offer to settle,[4] and opposed any reduction of the stipulated $76 million minimum balance in securities and cash. (Hodgkins Decl. ¶ 41).  It held strong to this position despite acknowledging later that, at the time, it plainly did not know "whether some of the frozen funds could be traced to entities or individuals other than Caledonian who might have . . . traded in the subject securities." (Hodgkins Decl. ¶ 38.)  Caledonian offered no evidence to the SEC one way or the other. Instead, it announced it would seek relief from this Court.  (Hodgkins Decl. ¶ 44.)  But in the SEC's view, Caledonian's liquidation was inevitable.  (See Hodgkins Decl. ¶ 44 ("[I]t was unclear to me that lowering the minimum account balance would avert liquidation.").)  That decision to adhere to the $76 million minimum balance was fateful.

On Tuesday afternoon, Caledonian's counsel telephoned Chambers ex parte and spoke to a law clerk to schedule a telephone conference for another emergency application.  In that call, Caledonian's counsel disclosed to this Court for the first time that Caledonian's net equity was only $25 million and any sum above that amount represented depositors' monies. This Court instructed counsel to place the request for relief and the startling disclosure about net equity in a letter to the Court.  Counsel was further advised that the emergency application would be addressed forthwith.

---

[4] Caledonian had offered to settle for $5 million.  SEC officials determined they "could not recommend the settlement proposal to the Commission because the financial relief was inadequate when considering the proceeds Caledonian received from the sales at issue in the case, which by [their] calculations was [sic] approximately $34 million, and Caledonian's balance sheet . . . indicated that the bank had assets significantly greater than $5 million." (Hodgkins Decl. ¶ 41.)

Caledonian never filed that application.  Later that day, the Cayman Islands Monetary Authority ("CIMA") placed Caledonian Bank and Caledonian Securities into controllership.  In response, the bank presented a petition to the Financial Services Division of the Grand Court of the Cayman Islands seeking to place Caledonian into a voluntary liquidation. But the Cayman Islands court dismissed the voluntary liquidation petition and upheld CIMA's appointment of a controller.  (Letter from Caledonian dated February 14, 2015 (ECF No. 25).)

Subsequently, Caledonian Bank notified this Court that it had filed a Chapter 15 Petition in the United States Bankruptcy Court for the Southern District of New York to recognize the Cayman Islands proceeding as the "foreign main proceeding."  (See Letter from Caledonian Bank dated February 16, 2015, ECF No. 26; see also In re Caledonian Bank Ltd., No. 15-10324 (Bankr. S.D.N.Y. filed Feb. 16, 2015).)  Thereafter, the litigation with respect to both Caledonian entities was sidelined and approximately $350 million held in U.S. accounts was transferred to the Cayman Islands for liquidation.[5]

Meanwhile, Verdmont litigated the SEC's application for a preliminary injunction.  Verdmont sought and obtained extensions of time and ultimately, on February 24, submitted opposition papers in which it disclosed that it acted only as a broker and that the funds frozen by the SEC were largely those of its customers.  While Verdmont identified various entities as its "customers," some were corporate veils that were not lifted to reveal who was really behind them.  Such non-disclosure complicated the SEC's task of tracing proceeds. Nevertheless, three days later, the SEC and Verdmont agreed to reduce the minimum balance

---

[5] On October 29, 2015, the SEC advised this Court that the Commission approved the staff's recommendation for a proposed settlement with Caledonian.  The SEC indicated that Caledonian's liquidators have sought the Cayman Islands court's approval of that proposed settlement in order to "minimize costs" and "protect the amount of funds available . . . to depositors unrelated to this action."  (SEC Letter dated Oct. 29, 2015 (ECF No. 136-1, at 4).)  The SEC has indicated that it will present the settlement terms for this Court's approval after it receives authorization from the Cayman Islands court.  (SEC Letter dated August 21, 2015 (ECF No. 132).)

Verdmont was required to maintain from $19 million to $2 million. (Preliminary Injunction

Consented and Stipulated to by the SEC (ECF No. 59).) As the SEC later explained, this sum

represented "the amount (with a $500,000 cushion) that Verdmont could afford to have frozen

without falling below its net capital requirements under Panamanian law." (Simpson Decl. ¶ 17.)

At the request of Verdmont and the SEC, the preliminary injunction hearing was cancelled and

the parties lapsed into a more traditional pretrial schedule, even suggesting that an initial pretrial

conference was not necessary. (Letter from Verdmont dated March 18, 2015 (ECF No. 61)

(expressing "hope that submission of the Discovery Plan . . . will obviate the need for [an initial

pretrial] conference").) But this Court scheduled one anyway.

III. Initial Pretrial Conference

      The May 2015 initial pretrial conference was enlightening. Under the pretense of

submitting courtesy copies of the pleadings in anticipation of that conference, the SEC informed

this Court by letter that it now believed Verdmont had a more limited role in the alleged

unlawful sales than previously described in the Complaint. For an enforcement agency with vast

investigative powers, the SEC's disclosure was chillingly casual and bears repeating:

> As it reads the Complaint in preparation for the May 21, 2015 initial
> pretrial conference, the Court should note that the SEC made allegations to
> the effect that Defendants . . . sold all of their shares of Swingplane
> Ventures, Inc., Goff Corporation, Norstra Energy Inc., and/or Xumanii,
> Inc., and that such sales generated proceeds 'for Caledonian, Clear Water,
> Legacy Global, and Verdmont.' . . . Subsequent to the filing of the
> Complaint, the SEC was provided with evidence that Verdmont, at least,
> sold Goff, Nostra and/or Xumanii securities for the account of three
> Verdmont customers—international business corporations known as
> Lornex Financial Ltd., Nautilus Growth Fund, Inc. and/or Bartlett Trading
> Inc.—and that Verdmont credited the sale proceeds, minus commissions,
> to one or more of these three customers. In light of this evidence, the SEC
> does not contend that Verdmont sold Goff, Norstra, or Xumanii securities
> for its own account or that Verdmont retains possession of the sale
> proceeds aside from commissions. Instead, the SEC contends that
> Verdmont sold Goff, Nostra and Xumanii securities for the account of

>    Lornex, Nautilus, and Bartlett.  However, Verdmont is still liable for
>    violating Section 5 of the Securities Act . . . .

(Letter from SEC dated May 13, 2015 (ECF No. 84).)  Remarkably, the SEC had apparently

reached that conclusion months earlier.[6]  Back in March, the SEC had suggested to Verdmont,

but not to this Court, that it would amend its Complaint.  (Simpson Decl. ¶ 20.)  However, the

SEC then allowed its time to amend as of right to expire and did not raise the issue with this

Court until its letter of May 13.  One can only wonder how much longer the SEC would have

waited had this Court not scheduled a conference.

At the May 21 conference, this Court sought to engage the SEC about its

proposed motion to amend.  That effort was frustrated because the SEC neither circulated the

proposed Amended Complaint in advance, nor brought a copy to the conference.  Nevertheless,

this Court expressed its concern about the basis for the SEC's original allegations that Verdmont

was the beneficiary of millions of dollars of unlawful proceeds, and inquired whether the same

might be true with respect to Caledonian.  Unreassuringly, the SEC's counsel responded "I don't

believe so."  (Transcript of May 21, 2015 Conference 6:20 (ECF No. 95).)

While motions to amend are generally unnecessary at an early stage in litigation,

such a motion was appropriate here to provide a vehicle for the SEC to explain its actions,

including its refusal to reduce the previously agreed minimum balances in Caledonian's accounts

when it learned Caledonian's total equity was only $25 million.  Further, during that conference,

Verdmont lamented its decision to agree to a $2 million minimum balance when it had earned

only $239,955 in commissions.  (See May 21 Tr. 15:24–19:7.)  This Court scheduled an

evidentiary hearing to address Verdmont's concern in the event the SEC continued to insist on

---

[6] As explained below, the SEC was in possession of documentary evidence confirming Verdmont's role as a broker as early as February 11.

$2 million.  For a conference that none of the parties thought necessary, much was revealed on May 21.  But that proved to be just the tip of an iceberg.

IV. The SEC's Motion to Amend the Complaint

The SEC's motion to amend included declarations from SEC and Financial Industry Regulatory Authority ("FINRA") officials about the investigation they conducted prior to seeking a freeze order and why they sought to maintain such substantial asset freezes.  Those declarations raised a number of questions about the thoroughness of the investigation that led Caledonian to collapse and challenged Verdmont's continued viability.

The SEC attorney supervising this investigation described the difficulties the SEC faced in ascertaining who the beneficiaries of the alleged stock schemes were because their accounts were in offshore financial institutions: "To determine for certain whether Caledonian and Verdmont were selling for their own account or on behalf of customers would require a review of the actual [foreign] account statements for the customers maintained by Caledonian and Verdmont."  (Hodgkins Decl. ¶ 22.)  He explained further that SEC staff working on this case "had no knowledge of any relevant Caledonian or Verdmont customer account statements available to the SEC" at the time the action was commenced.  (Hodgkins Decl. ¶ 22.)  But it appears that this was not true for other attorneys at the SEC who were already investigating the same network of offshore entities.

On September 8, 2014, five months before the Caledonian complaint was filed, the United States Attorney for the Eastern District of New York indicted Legacy Global and a number of other defendants for allegedly concealing their clients' beneficial interest in U.S. issuers and "engineering . . . artificial price movements and trading volume" in the stocks of those companies.  United States v. Bandfield, No. 14-cr-00476 (E.D.N.Y. filed September 8,

2014).  The SEC's New York Regional Office followed on with an enforcement action the

following day.  See S.E.C. v. Bandfield, No. 14-cv-5271 (E.D.N.Y. filed Sept. 9, 2014)

(violations of Exchange Act Rule 13d-1's reporting requirement by the alleged founder of

Legacy Global).

It turns out that a foreign regulatory authority—perhaps in connection with the

activities in the Eastern District[7]—had previously produced account statements indicating

Verdmont had acted as a broker, not a principal with respect to the transactions in this case.

Those documents were provided to the SEC's Office of International Affairs, then to the SEC's

New York Regional Office.  The SEC attorneys in Washington, D.C. did not learn of those

documents until the week of February 16.

Embarrassingly, it was a foreign regulator—not SEC lawyers in New York—who

finally suggested to the SEC's Washington lawyers that they rummage through their own files

for answers to the questions they were asking about Verdmont and its clients.  That regulator

informed the SEC's Washington lawyers that account documentation relating to Verdmont's

trades had previously been provided to SEC lawyers in New York.  The explanation by the SEC

attorney who signed the Complaint in this action acknowledges the failure to coordinate

litigation activities:

> Sometime in the week of February 16, 2015, I reviewed the documents
> that the SEC's New York Regional Office made available to me on
> February 11, 2015.  These documents had been provided to the SEC's
> Office of International Affairs ("SEC OIA") by a foreign regulatory
> authority, and SEC OIA forwarded the documents to the New York
> Regional Office.  Neither I nor anyone working on this litigation knew of
> the existence of these documents until after a confidential communication

---

[7] This aside is based on recent representations from SEC counsel in New York in SEC v. Norstra, No. 15-cv-4751 (S.D.N.Y. filed June 18, 2015), reporting that she was unaware of the documents produced by a foreign regulatory body relating to Verdmont or Norstra.  (Transcript of October 29, 2015 Initial Pretrial Conference 9:12–10:7, Norstra, No. 15-cv-4751.)

> with a representative of the foreign regulatory authority on February 11,
> 2015.

(Simpson Decl. ¶ 11.) Thus, the SEC attorneys in Washington, D.C. were either unaware that SEC attorneys in New York were pursuing an investigation of some of the same defendants elsewhere, or chose not to coordinate with them. Either scenario is disheartening. And even after an attorney from the New York Regional Office was assigned to this action, the SEC's litigation activities were not synchronized.[8]

Months later, the disconnect has only become more stark. On June 18, attorneys in the New York Regional Office filed a separate action in this District alleging Norstra's participation in the fraudulent stock-promotion campaign that is part of the alleged pump-and-dump operation here. SEC v. Norstra, No. 15-cv-4751 (S.D.N.Y. filed June 18, 2015). The SEC's New York attorneys failed to mark Norstra as related to Caledonian, and thus it was initially assigned to Judge Robert Sweet. After learning from the SEC's "news clip" service that Norstra securities were involved in Caledonian, the New York Regional Office wrote to Judge Sweet and this Court stating that while "some facts and circumstances regarding the alleged 'pump and dump' of Norstra securities," were implicated in both cases, "coordinated pretrial proceedings" were unnecessary because the SEC had elected to sue different defendants on different legal theories in the second action. At a hearing in Caledonian, the SEC's Washington, D.C. attorneys conceded that the conduct in the two actions "overlap[s] a little bit." (Transcript of July 16, 2015 Oral Arg. 49:1–2 (ECF No. 127).) And after Norstra was reassigned from Judge Sweet to this Court, the lead SEC attorney in Norstra acknowledged, "I think if I had it to

---

[8] Early on, as a matter of practice, this Court urged the SEC's Washington attorneys to involve counsel from their New York Regional Office in this litigation. (Transcript of February 9, 2015 Teleconference 4:11–15 (ECF No. 34).) When the SEC failed to heed that suggestion, this Court was forced to order it on May 21. (Transcript of May 21, 2015 Conference 23:9–16.)

do over again, I certainly would have checked the related box . . . if only in an abundance of caution." (Transcript of October 29, 2015 Initial Pre-Trial Conference 12:21–24, <u>SEC v. Norstra</u>, No. 15-cv-4751 (S.D.N.Y. filed June 18, 2015).)

   Adding to the confusion, the SEC, in rapid-fire fashion, then filed two more actions in the Eastern District of New York involving three of the offshore entities named as defendants in this case. <u>SEC v. Mulholland</u>, No. 15-cv-3668 (E.D.N.Y. filed June 23, 2015) (alleging Section 5 violations against Gregg Mulholland, an IPC client who allegedly controlled Legacy Global and used Caledonian Bank and Legacy Global to make unregistered distributions of penny-stock securities); <u>SEC v. Kueber</u>, No. 15-cv-4479 (E.D.N.Y. filed July 31, 2015) (fraudulent misrepresentation of ownership of penny-stock issuer by Clear Water's Chief Executive Officer). In the wake of the related-case contretemps in this District, the SEC informed the three judges in the Eastern District to whom the cases were assigned—but not this Court—that it might be in the interest of judicial economy to assign them to the same judge.[9] (<u>See</u> Letter Dated August 4, 2015, <u>SEC v. Bandfield</u>, No. 14-cv-5271 (E.D.N.Y. filed Sept. 9, 2014).)

   Taking into account all five civil cases split between the Southern and Eastern Districts, the SEC has now deployed at least sixteen attorneys to litigate cases involving overlapping factual circumstances. At an initial pretrial conference in <u>Norstra</u>, this Court asked the lead SEC attorney to explain the diaspora of enforcement actions involving similar defendants and factual circumstances in adjacent districts. The SEC's response—in all its gratifying candor—was remarkable:

---

[9] All three civil actions in the Eastern District, and the criminal action, are now before Senior District Judge I. Leo Glasser.

> You won't like the answer, your Honor, frankly because it will indicate to you a lack of coordination that we have tried to repair in the interim. . . . I understood that a Caledonian case had been filed, and my understanding of the allegations in the complaint, which I was not sent and did not see, was that the Caledonian case alleged Section 5 claims against . . . offshore entities, and the nature of the claim was that, with respect to four issuers, including Norstra, there had been manipulation or unregistered distribution of securities. . . . And serendipitously, when I went to file this complaint, the very next day I saw on our news clip summary . . . a notice that the Caledonian complaint had been amended, and I said to my colleague . . . we should get that complaint and make sure that there is nothing in it that we don't know about.

(Transcript of October 29, 2015 Initial Pretrial Conference 11:10–12:7, <u>SEC v. Norstra</u>, No. 15-cv-4751 (S.D.N.Y. filed June 18, 2015).)  Initially, the filing of <u>Norstra</u> without relating it to <u>Caledonian</u> and the subsequent letter appeared to be judge shopping.  But now, the separate filings appear more the product of bureaucratic siloing than any calculated litigation strategy.  Just as the SEC's Washington attorneys were unaware of key documents received by the SEC's Office of International Affairs, and transmitted to the SEC's New York Regional Office for its investigation, so the New York Regional Office was unaware of allegations made by SEC staff in Washington in this securities enforcement action alleging the same pump-and-dump scheme.

It is hard for this Court to believe that the SEC does not have systems in place to ensure that enforcement and regulatory staff are aware of investigations with common facts or the same individuals or entities.  And it is hard to believe that those charged with overseeing enforcement are not monitoring activities to avoid needless duplication of effort.  Given the high stakes in securities enforcement actions, and in the face of a workload the SEC describes as an "overwhelming burden,"[10] a self-examination may be appropriate.  Commission introspection could lead to a review and effective implementation of procedures in the Division of

---

[10] (May 21 Oral Arg. Tr. 21:1–2 (ECF No. 95.).)

Enforcement and related operational offices to ensure that investigations are coordinated and scarce resources are deployed efficiently.

But here, the SEC's failure to coordinate spawned more dire consequences than administrative inefficiency. The declarations submitted in connection with the SEC's motion to amend reveal an apparent failure to pose the appropriate inquiries to financial institutions before seeking crippling ex parte asset freezes. Prior to filing this action, the SEC asserted it had been "in frequent contact" with the legal departments of the U.S. financial institutions against whom it sought to enforce the asset freeze, including Interactive Brokers LLC and Northern Trust International Banking Corporation. (Hodgkins Decl. ¶¶ 26–27.) However, it is not clear what questions the SEC asked to ascertain whether those assets belonged to the defendants—like Verdmont or Caledonian Bank—as opposed to their customers. The SEC reports that after filing the Complaint, Interactive Brokers "confirmed that the account [in Verdmont's name] had no beneficial ownership information" and that it could not ascertain "what particular assets, if any, were held for customers of Verdmont." (Hodgkins Decl. ¶ 25.) But the SEC acknowledged that this information may have been shared with SEC staff before the Complaint in this action was filed. (Hodgkins Decl. ¶ 25 ("SEC staff reporting to me believes that Interactive Broker's Chief Compliance Officer shared this information with SEC staff prior to filing the Complaint.").) The SEC was more oblique with respect to the scope of its inquiry of Northern Trust—simply asserting that Northern Trust "did not inform the SEC that Caledonian's account . . . contained funds belonging to Caledonian's customers." (Hodgkins Decl. ¶ 26.) In sum, it appears the SEC made no robust effort to ascertain the beneficial ownership of the assets it sought to freeze.

In explaining its initial decision to insist on the maintenance of tens of millions of dollars in U.S. accounts, the SEC contends that even if it could not demonstrate Caledonian and

Verdmont acted as principals, it was nevertheless appropriate to freeze those assets.  The SEC

argues that such an asset freeze would ensure its ability to disgorge the proceeds received by

Caledonian and Verdmont's clients, plus a penalty, on a theory of joint and several liability.

(See, e.g., Hodgkins Decl. ¶ 29.)  But this Court granted the temporary restraining order based on

the SEC's representations that the proceeds of the illegal sales and the funds in the accounts to be

frozen belonged to Caledonian and Verdmont, not their clients.  And it is within this Court's

discretion, not the SEC's, to determine whether joint and several liability is appropriate and

whether the SEC was "likely to succeed" on its broker liability theory.  (See Simpson Decl. ¶

17.)  If the SEC had wanted to freeze the assets of unknown customers of the Defendants, it

would have faced a different standard.[11]  While a pleading need not articulate any particular legal

theory, the SEC's theory in this case bore directly on the propriety and magnitude of the ex parte

relief it sought.  And in this Court's view, the SEC had an obligation to come forward with

information that undermined the allegations in the Complaint and its TRO application as soon as

it learned of it.

        Just days after filing its motion to amend, the SEC agreed on June 2 to reduce the

minimum account balance for Verdmont to $239,955, rather than come forward at an evidentiary

hearing and demonstrate the propriety of continuing the maintenance of a $2 million balance.

(See Letter from SEC dated June 2, 2015 (ECF No. 94); see also First Modified Preliminary

---

[11] When an asset freeze is sought, the SEC may rely on an "inference . . . that the party has violated the
federal securities laws."  Smith v. SEC, 653 F.3d 121, 127–28 (2d Cir. 2011) (citations omitted); see also SEC v.
Dorozhko, 606 F. Supp. 2d 321, 323 (S.D.N.Y. 2008) (permitting inference in SEC's application for a preliminary
injunction that the proceeds from sales in the defendant's brokerage account related to hacking activities based on
"the fact of the [computer] hack" and the "proximity" of the hack to Dorozhko's later trades), rev'd on other
grounds, 547 F.3d 42 (2d Cir. 2009).  However, to freeze funds belonging to someone who is not accused of
violating the securities laws at all (a so-called "relief defendant"), the burden "rests with the [SEC] to show that the
funds in the possession of the [relief defendant] are ill-gotten."  Smith, 653 F.3d at 128 (citing SEC v. Cavanagh,
155 F.3d 129, 133 (2d Cir. 1998)).

Injunction (ECF No. 97).) Thus, the SEC agreed to reduce the "freeze" on Verdmont's accounts

from $19 million to $2 million and then to only $239,955. Similarly, the SEC agreed with

Caledonian's liquidators in a stipulated preliminary injunction to reduce its "freeze" order from

$76 million to $7 million—but only after the bank had already collapsed. (Preliminary

Injunction Stipulated to by the SEC and Caledonian, March 23, 2015 (ECF No. 67).) The sheer

magnitude of these reductions suggests that the SEC's foray for temporary relief was

government overreach. And recently, the SEC indicates that the Commission has authorized a

proposed settlement with Caledonian that awaits the approval of Cayman Islands authorities

before it can be submitted to this Court for consideration. But ominously, the SEC references the

need to "minimize costs" and "protect . . . depositors," as opposed to recovering ill-gotten gains

for innocent investors. (SEC Letter dated Oct. 29, 2015 (ECF No. 136-1, at 4).)

V. The Amended Complaint

        Ultimately, the parties stipulated to the filing of the Amended Complaint, with

Verdmont eager to interpose an Answer and file its motion for judgment on the pleadings. The

proposed Amended Complaint blunted many of the harshest and most categorical allegations in

the original Complaint.[12] Characterizations that Caledonian or Verdmont had acted as principals

and lined their pockets were recast or abandoned altogether. Contrary to the SEC's

representations at the May 21 conference, the SEC alleges in its Amended Complaint that

Caledonian may also have been a broker, stating: "Caledonian Bank and Caledonian Securities

---

[12] For example, the original Complaint alleged that "Norstra's initial public offering and the associated Form S-1 were a sham because there was no distribution of the securities supposedly issued to the shareholders, and Norstra and its affiliates retained control of those securities." (Compl. ¶ 63.) The Amended Complaint deletes that sentence but adds an allegation that: "The facts and circumstances described . . . above support the inferences that: (a) the Norwegian and Panamanian shareholders were nothing more than nominees; (b) there was no distribution of the Norstra securities supposedly issued to the shareholders; (c) Norstra and its affiliates retained control of the Norstra securities; and (d) the Form S-1 registration statement was a sham." (Am. Compl. ¶ 75.)

have represented through counsel that they sold for the account of customers and received commissions on the sales." (Am. Compl. ¶ 64 (Goff); see also Am. Compl. ¶ 43 (Swingplane), ¶ 80 (Norstra), ¶ 96 (Xumanii)).[13]   And retreating from its allegations that Verdmont sold the penny stocks for its own benefit, the SEC now alleges: "Verdmont sold for the account of customers and received commissions on the sales."[14]   (E.g., Am. Compl. ¶ 64.)   In the context of the ex parte relief sought by the SEC, these amended allegations are seismic.[15]

But this Court must now consider the Amended Complaint in the context of a motion for judgment on the pleadings—presuming them to be true, despite their troubled origins. Accordingly, the following allegations are gleaned from the Amended Complaint.

Verdmont dealt with three of the four penny stocks described in the Amended Complaint—Goff, Norstra, and Xumanii.   It sold these securities on behalf of its clients during a period of aggressive promotions despite the fact that each company had few or no assets and no revenues.   Verdmont received commissions for those sales.

The transactions leading to the sales of each security followed a similar pattern. Goff, Norstra, and Xumanii (formerly known as "Medora") were development or exploration stage companies incorporated in Nevada.   Each filed an S-1 registration statement with respect to

---

[13] The SEC qualifies these allegations in its motion to amend, explaining that due to Cayman Island bank secrecy laws, it has yet to receive documentary evidence demonstrating Caledonian acted as a broker. (SEC Memorandum of Law in Support of Motion to Amend Complaint at 1, ECF No. 90.)

[14] Specifically, Verdmont sold for three customers—Lornex, Bamfield, and Nautilus.  (See Declaration of Taylor Housser dated June 9, 2015, ¶¶ 7–10 (ECF No. 106).)  Two of those clients ceased to be clients of Verdmont nearly four months before the Complaint was filed in this case.  (See Declaration of Glynn Fisher dated June 9, 2015, ¶ 3 (ECF No. 105) (explaining Lornex and Nautilus' accounts were closed in October 2014).)

[15] To date, Caledonian has allegedly represented that it sold securities only for the account of its customers, but "because of Cayman Islands bank secrecy laws, the SEC does not . . . possess evidence verifying that fact." (Simpson Decl. ¶¶ 7–8.)  The proposed settlement with Caledonian, when and if it is submitted to this Court for approval, should address any discussions between Caledonian and the SEC about the beneficial ownership of the shares Caledonian sold.

purported initial (in the case of Norstra) or secondary "resale" (in the case of Goff and Xumanii)

offerings of the securities.  The SEC alleges the registration statements were "shams," designed

to create the appearance of a public distribution that never occurred.  The SEC alleges

Verdmont's clients, which the SEC describes only as "offshore IBCs [international business

corporations],"[16] received these securities from the issuer (or its affiliates) and resold them to the

public, reaping millions of dollars in proceeds.  Verdmont identifies its clients using their

nondescript corporate monikers, such as "Bartlett Trading," "Nautilus," and "Lornex."  (See

Letter from SEC dated May 13, 2015 (ECF No. 84).)

       While the timeframes varied, the chain of events unfolded in a similar fashion

with respect to each stock.  Central to the SEC's "sham" theory are transfers effectuated by

Empire Stock Transfer, which acted on instructions from Celtic Consultants.  In each case,

Empire mailed stock certificates to the issuer, rather than the individual shareholder who

purportedly purchased the stock.  (Am. Compl. ¶ 49 (certificates mailed to Goff in Ireland); ¶ 68

(certificates mailed to Norstra in Norway); ¶ 85 (certificates mailed to Xumanii in Jamaica).)

Celtic Consultants sent Empire some of those certificates with instructions to transfer them to

Verdmont's clients.  The transfer documents were irregular in that shareholders may not have

signed them or authorized transfers to Verdmont's clients.[17]  (See Am. Compl. ¶ 50 (rather than

being stamped with medallion guarantees by a financial institution, the Irish shareholders'

signatures were "guaranteed" by Goff officer O'Flynn); ¶ 69 (Norwegian and Panamanian

---

[16] (See May 21 Oral Arg. Tr. 37:9–10 (ECF No. 95).)  The SEC emphasized that regardless of who controlled the IBC accounts, they "all began trading on a coordinated basis on what appears to be the same day shortly after [allegedly fraudulent] promotional activities began."  (May 21 Oral Arg. Tr. 36:24–37:1.)

[17] In the case of Swingplane securities, the sales of which followed a similar pattern, six shareholders never received the stock or agreed to its transfer to Caledonian, Clear Water, and Legacy Global. (See Am. Compl. ¶¶ 23, 31.)

Norstra shareholders' stock power documents, notarizations, board resolution, and Celtic's shipping label to Empire were all dated the same day); ¶ 86 (Xumanii certificates contained powers of attorney signed by 17 Jamaican shareholders on the same day a Nevis bank issued medallion stamps).) And the SEC alleges that each issuer "stepped in and supplied a board of directors resolution, . . . directing Empire to make the transfers." (Am. Compl. ¶ 50 (Goff); see also ¶ 69 (Norstra), ¶ 86 (Xumanii).) As a result, Empire issued new stock certificates to Verdmont's clients which were deposited into Verdmont's accounts. (See Am. Compl. ¶ 50 (Goff); ¶¶ 69–70 (Norstra); ¶ 86 (Xumanii).) According to the SEC, this irregular pattern tends to show that the initial shareholders were nominees used to create the appearance of a public offering and distribution. The SEC alleges that the reality was that the issuers (or their affiliates) still controlled the shares when they were handed off to Verdmont's clients.

Goff and Xumanii effectuated stock splits that multiplied the shares held by Verdmont's clients. (See Am Compl. ¶ 54 (25-for-1 for Goff); ¶ 89 (5.5-for-1 for Xumanii).) Each company represented it had undergone a change in control and business plan—e.g., through a reverse merger, contract, or business combination with operating companies. Goff went from offering job placement services in the United Kingdom and Ireland to mineral exploration in Colombia. (Am. Compl. ¶¶ 47, 58.) Xumanii[18] went from selling travel coupons to Jamaican tourists to a social networking website allowing consumers to broadcast shows and events. (Am. Compl. ¶ 88.) And Norstra claimed a "lucrative" ownership interest in an oil and gas property in Montana through a "farmout agreement" that required it to pay approximately 140 times its

---

[18] The company which originally issued the shares was called "Medora Corp.," and later changed its name to Xumanii as part of its change in ownership and business plan. (Am. Compl. ¶ 88.)

current assets over the next eighteen months.[19]  (See Am. Compl. ¶ 73.)  As these new business

ventures were touted in aggressive stock promotion campaigns, Verdmont's clients—Lornex,

Nautilus, and Bartlett—sold large numbers of shares into public markets.  Specifically, in 2013,

(1) Lornex sold Goff securities for "proceeds" of $3,526,354 (Am. Compl. ¶ 63); (2) Lornex,

Nautilus, and Bartlett sold Norstra securities for "proceeds" of $8,073,497 (Am. Compl. ¶¶ 16,

80); and (3) Lornex sold Xumanii securities for "proceeds" of $6,064,353 (Am. Compl. ¶ 96).

Verdmont earned brokerage commissions on these sales.

DISCUSSION

I.      Legal Standard

        Verdmont advances three arguments in favor of its Rule 12(c) motion for

judgment on the pleadings.  First, Verdmont argues that the Amended Complaint fails to

establish a prima facie Section 5 case.  Second, Verdmont asserts that the SEC has failed to state

a plausible claim because, on the face of the pleadings, Verdmont's affirmative defenses of the

Securities Act's "dealer exemption" and "broker's exemption" apply.  Finally, Verdmont argues

it cannot be jointly and severally liable for disgorgement based on profits earned by its clients.

        A motion for judgment on the pleadings under Rule 12(c) employs "the same . . .

standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)."  E.E.O.C. v. Port Auth.,

768 F.3d 247, 253 (2d Cir. 2014) (citation omitted).  This Court thus accepts all factual

allegations in the Amended Complaint as true, and draws all reasonable inferences in the

Plaintiff's favor.  E.E.O.C., 768 F.3d at 253.  However, this Court is not bound to accept as true

legal conclusions couched as factual allegations.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

---

[19] A farmout agreement is a "contract whereby the owner of a working interest in an oil and gas lease assigns all or part of that interest to another party in exchange for the other party fulfilling contractually specified conditions, typically relating to drilling a well within a certain time frame."  Complaint at 5 n.1, SEC v. Norstra, No. 15-cv-4751 (S.D.N.Y. filed June 18, 2015).

(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Only a complaint that states a plausible claim for relief survives a motion to dismiss.  LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 476 (2d Cir. 2009) (citing Iqbal, 556 U.S. at 679–80).  Ultimately, "[t]he plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quotation marks omitted).  "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." Fink v. Time Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013) (per curiam) (citation omitted).

At the moment, courts disagree on whether affirmative defenses—such as those asserted by Verdmont—must be "plausibly" pled in an answer, like the claims in a complaint. See, e.g., Tardif v. City of New York, 302 F.R.D. 31, 32–33 (S.D.N.Y. 2014) (collecting cases). However this conflict is ultimately resolved, it does not alter the movant's burden in this case, as the SEC has "no obligation to anticipate and refute [the defendant's] potential affirmative defenses." Rosen v. Brookhaven Capital Mgmt. Co., 194 F. Supp. 2d 224, 227, 228 (S.D.N.Y. 2002).  Looking to the pleadings, all that the Amended Complaint must do to "survive" a Rule 12(c) motion is to "state a claim to relief that is plausible on its face." Johnson v. Rowley, 569 F.3d 40, 44 (2d Cir. 2009) (citation omitted).

II.    Section 5 Violation – Prima Facie Case

The registration requirements of Section 5 of the Securities Act ensure that investors receive information sufficient to make informed investment decisions. See SEC v. Ralston Purina Co., 346 U.S. 119, 124 (1953).  Sections 5(a) and 5(c) require that securities be registered before they can be sold or offered for sale. 15 U.S.C. § 77e(a), (c).  To state a Section

5 claim, the SEC must allege: "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." SEC v. Cavanagh ("Cavanagh IV"), 445 F.3d 105, 111 n.13 (2d Cir. 2006) (internal quotation marks and citations omitted).

Verdmont argues that the Amended Complaint fails to plausibly allege that a registration statement was not filed for the securities that were sold. Notwithstanding the SEC's theory that the registration statements were "shams," (Am. Compl. ¶¶ 64, 81, 97), there is no dispute that Form S-1 registration statements were filed for each security and that the SEC declared each of them effective pursuant to Section 8(a) of the 1933 Act. And despite what the SEC now characterizes as "preposterous representations contained in the registration statements," (Hodgkins Decl. ¶ 13), during the relevant period the SEC failed to take any action to delay or suspend their effectiveness by way of a "stop order" or otherwise.[20] See, e.g., 15 U.S.C. § 77h(d) ("If it appears to the Commission at any time that the registration statement includes any untrue statement of a material fact . . . the Commission may . . . issue a stop order suspending the effectiveness of the registration statement") (emphasis added); see also THOMAS LEE HAZEN, 1 LAW OF SECURITIES REGULATION § 3.6 (6th ed. 2011) (discussing "SEC machinery" for dealing with registration statements once filed).

However, the "registration of a security is transaction-specific." SEC v. Cavanagh ("Cavanagh II"), 155 F.3d 129, 133 (2d Cir. 1998); see also SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007). When a registration statement is filed,

---

[20] However, the SEC did issue an order suspending trading in Norstra Energy stock after Verdmont had already purchased and resold the securities for its clients, more than one year after its registration statement became effective. Trading in Norstra Energy was halted from June 26 to July 10, 2013. See SEC. & EXCH. COMM'N, TRADING SUSPENSIONS ARCHIVE: 2013, available at https://www.sec.gov/litigation/suspensions/suspensionsarchive/ susparch2013.shtml; see also Complaint at ¶ 3, SEC v. Norstra Energy Inc., 15-cv-4751 (filed June 18, 2015).

it is that specific _offering_ of securities that is registered; the securities themselves are not considered registered for all times and all purposes. _See Cavanagh II_, 155 F.3d at 133 (registration statement covering issuance to management did not cover reoffering of shares to other persons). If a later offering occurs, the securities sold in that offering will either be "registered, exempt, or illegal." _See_ THOMAS LEE HAZEN, 1 LAW OF SECURITIES REGULATION § 4.1 (reviewing exemptions). Thus, it is of no moment whether the initial offering was covered by a valid registration statement because the SEC has plausibly alleged that Verdmont later _resold_ the securities for its clients in offerings bereft of separate registration statements. (Am. Compl. ¶¶ 1, 63, 75, 96; Answer ¶¶ 63, 80, 86, 96, 100.) The SEC has adequately pled a prima facie case for Section 5 liability.[21]

### III.   Section 5 Violation – Exemptions

To prevail on its motion, Verdmont must demonstrate that its alleged offerings were exempt from the registration requirement. _See Cavanagh IV_, 445 F.3d at 111 n.13 (citing _Ralston Purina_, 346 U.S. at 126) ("Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption."). Verdmont argues that its transactions are covered by Section 4(a)(3)'s exemption for certain dealer transactions occurring after a public offering and Section 4(a)(4)'s exemption for certain unsolicited broker's transactions.

### A.   Section 4(a)(3) Dealer Exemption

Section 4(a)(3) exempts from registration "transactions by a dealer," 15 U.S.C. § 77d(a)(3), meaning "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise

---

[21] The only persons liable for violations of the registration requirement under the Securities Act are issuers, underwriters, or dealers. 15 U.S.C. § 77d(a)(1). However, the Answer concedes that Verdmont was a "broker-dealer in Panama" trading in securities on behalf of its clients. (Answer ¶¶ 11, 100.)

dealing or trading in securities issued by another person," § 77b(a)(12).  The exemption does not protect dealers who transact in securities shortly after the public offering.  Dealers are not exempt if the transaction took place: (1) "prior to the expiration of forty days after the effective date of [the] registration statement" or (2) "prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter," "whichever is later." § 77d(a)(3)(B).  The purpose of this buffer period is to "prevent dealers from even unknowingly taking part" in the initial distribution of securities to the public.  SEC v. N. Am. Res. & Dev. Corp., 280 F. Supp. 106, 125 (S.D.N.Y. 1968), vacated in part on other grounds, 424 F.2d 63 (2d Cir. 1970).  Because the "vast majority of day-to-day transactions occur more than forty . . . days after the securities were offered to the public," this section exempts "most transactions" taking place in U.S. securities markets.  THOMAS LEE HAZEN, 1 LAW OF SECURITIES REGULATION § 4.31, at 54 (6th ed. 2011).

   Normally, the two components of the disjunctive "whichever is later" test occur simultaneously.  "[O]rdinarily, a security is 'bona fide offered to the public' at the effective date of the registration statement."  Finkel v. Stratton Corp., 962 F.2d 169, 173 (2d Cir. 1992).  However, the statute "recognizes that there will be circumstances in which stock covered by an effective registration statement has not genuinely been offered to the public."  In re Lehman Bros. Sec. & ERISA Litig., 903 F. Supp. 2d 152, 171 (S.D.N.Y. 2012).  For example, if the parties created a sham distribution to conceal a public offering that took place later, the bona fide offering date would differ from the effective date of the registration statement.  To assess whether an offering is bona fide, "the relevant question . . . is when was the stock really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering."  P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 99 (2d Cir. 2004) (citing LOUIS LOSS & JOEL

SELIGMAN, SECURITIES REGULATION § 2–B–6, n.285 (3d ed. 1996)).  A registration statement alone does not make an offering bona fide.

Verdmont's argument is that the Goff, Norstra, and Xumanii securities were offered to members of the public when the SEC declared their S-1 registration statements effective: March 14, 2011 for Xumanii; November 10, 2011 for Goff; and July 12, 2012 for Norstra.  (See ECF No. 111, at 19.)  Verdmont argues that it purchased these securities for its clients well after the 40-day period expired, and sold the same securities for its clients even later.  On behalf of its clients, Verdmont first purchased Xumanii securities on February 22, 2012, and first sold them on May 1, 2013; first purchased Goff securities on August 8, 2012, and first sold them on March 18, 2013; and first purchased Norstra securities on February 5, 2013, and first sold them on April 1, 2013.  (See ECF No. 111, at 19.)

But this Court cannot rely on Verdmont's allegations in ruling on the motion for judgment on the pleadings.  Instead, this Court's analysis must turn on the SEC's allegations.  And the Amended Complaint alleges insider transactions designed to evade the Securities Act.  Instead of selling Goff, Xumanii and Norstra shares to the public in connection with their registration statements, each issuer allegedly retained control over the securities through affiliates and nominee shareholders.  (Am. Compl. ¶¶ 56, 75, 87.)  Verdmont's clients purchased the securities from the nominee shareholders and waited in the wings while aggressive and fraudulent stock promotions took place, artificially inflating the value of Goff, Xumanii, and Norstra securities.  (Am. Compl. ¶ 43, 63, 80.)  Finally, as these campaigns reached their zenith, Verdmont's clients allegedly sold the securities into the public markets, reaping millions.  (Am. Compl. ¶ 44, 64, 81; see also ECF No. 121, at 8.)

At bottom, Verdmont and the SEC disagree over whether the offerings in connection with the issuers' registration statements were "bona fide" offerings to the public, or whether they were merely "simulated offering[s]," P. Stolz Family P'Ship, 355 F.3d at 99. The SEC alleges that a coordinated delivery of shares by nominee shareholders to Verdmont's client accounts was combined with carefully timed sales to amass penny-stock securities until the fraudulent stock-promotion plan came to fruition. Only then were the securities allegedly dumped on the public at large, and only then did any genuine "offering" occur. At this stage in the litigation, it is too early to assess whether a bona fide offering occurred when the registration statements became effective, or whether no public offering occurred until Verdmont's clients sold the securities. See P. Stolz Family P'Ship, 355 F.3d at 99; cf. In re Biozoom, Inc. Sec. Litig., No. 14-cv-01087, 2015 WL 853448, at *12 (N.D. Ohio Feb. 26, 2015) (denying motion to dismiss where the complaint alleged "a series of transactions following the registration statement that may not have involved the public").

B. Section 4(a)(4) Broker's Exemption

The broker's exemption is a fall-back for brokers who cannot claim the dealer's exemption. See J. WILLIAM HICKS, EXEMPTED TRANSACTIONS UNDER THE SECURITIES ACT OF 1933 § 13:2 (2015). "Brokers," a species of dealer, are defined by the Securities Exchange Act of 1934 as "person[s] engaged in the business of effecting transactions in securities for the account of others."[22] 15 U.S.C. § 78c(a)(4)(A) (emphasis added). Because the SEC has sufficiently alleged a prima facie case against Verdmont for violation of the registration

---

[22] Notably, the Exchange Act—but not the Securities Act—defines the term broker. No party takes issue with its definition here.

requirement, Verdmont bears the burden of proving it is exempt under this provision. Cavanagh IV, 445 F.3d at 111 n.13 (citing SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953)).

Section 4(a)(4) exempts from the registration requirement "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders." 15 U.S.C. § 77d(a)(4). Because the SEC nonchalantly abandoned its earlier contentions that Verdmont traded for its own account, the Amended Complaint now concedes that Verdmont acted as a broker and does not allege that it solicited its clients' trades. (Letter from SEC dated May 13, 2015 (ECF No. 84); Am. Compl. ¶¶ 63, 80, 96.)

However, the only Courts of Appeals to address this issue have followed the SEC's longstanding view that in order to receive the Section 4(a)(4) exemption, brokers must conduct a "reasonable inquiry" into the securities transaction. World Trade Fin. Corp. v. SEC, 739 F.3d 1243, 1248 (9th Cir. 2014); Wonsover v. SEC, 205 F.3d 408, 415 (D.C. Cir. 2000); see also In re Quinn & Co., 44 S.E.C. 461, 1971 WL 120484, at *6 (1971). Each decision looks to Securities Act Rule 144, which provides a safe-harbor provision for brokers relying on the Section 4(a)(4) exemption.[23] That rule provides that the broker must not be aware "[a]fter reasonable inquiry" of "circumstances indicating that a person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is part of a distribution of securities of the issuer." 17 C.F.R. § 230.144(g)(4). A reasonable inquiry would examine the length of time the securities have been held, the nature of the transaction, the amount of securities recently sold, the relevant trading volume, and concurrent sales by multiple

---

[23] It is possible that a party relying on Rule 144's non-exclusive safe harbor might fail to satisfy the rule's reasonable-inquiry test but be exempt under Section 4(a)(4) itself. Cf. Cavanagh IV, 445 F.3d at 114 (noting that non-compliance with Rule 144 did not necessarily foreclose a Section 4(a)(1) exemption, but that parties face a "substantial burden of proof" in demonstrating such an exemption). In this case, Verdmont does not dispute the application of the "reasonable inquiry" requirement. (See ECF No. 111, at 20.) This Court declines to speculate on circumstances not presented here.

clients.  See 17 C.F.R. § 230.144(g)(4)(ii).  When assessing whether a broker's inquiry is

adequate,

> [t]he amount of inquiry called for necessarily varies with the circumstances
> of particular cases.  A dealer who is offered a modest amount of a widely
> traded security by a responsible customer, whose lack of relationship to the
> issuer is well known to him, may ordinarily proceed with considerable
> confidence.  On the other hand, when a dealer is offered a substantial block
> of a little-known security, either by persons who appear reluctant to
> disclose exactly where the securities came from, or where the surrounding
> circumstances raise a question as to whether or not the ostensible sellers
> may be merely intermediaries for controlling persons or statutory
> underwriters, then searching inquiry is called for.  The problem becomes
> particularly acute where substantial amounts of a previously little known
> security appear in the trading markets within a fairly short period of time
> and without the benefit of registration under the Securities Act of 1933.

SEC v. Elliot, No. 09-civ-7594, 2012 WL 2161647, at *7–8 (S.D.N.Y. June 12, 2012)

(citing Securities Act Release No. 4446, Exchange Act Release No. 6721, 27 Fed.

Reg. 1415 (Feb. 2, 1962)).

Admittedly, a broker's task in ascertaining whether its client may be an

underwriter is not easy because "the definition of 'underwriter' is indeed broad and is to be

interpreted broadly."  In re REFCO, Inc. Sec. Litig., 05-civ-8626, 2008 WL 3843343, at *4

(S.D.N.Y. Aug. 14, 2008).  But see Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167,

178 (2d Cir. 2011) (noting that the definition of an underwriter is limited to those persons who

play roles "essential in the actual distribution of securities").  An "underwriter" includes anyone

who "purchases from an issuer with a view to" or "offers or sells for an issuer in connection

with, the distribution of any security."  15 U.S.C. § 77b(a)(11).  The statutory "issuer" from

whom the underwriter purchases securities includes not only the issuer itself, but also those

"directly or indirectly controlling or controlled by the issuer" or "under 'direct or indirect

common control' with the issuer."  15 U.S.C. § 77b(a)(11); Cavanagh IV, 445 F.3d at 111.  The

"distribution" in which an underwriter takes part refers to the "process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." SEC v. Kern, 425 F.3d 143, 152 (2d Cir. 2005) (citations omitted). Whether one acquires shares with a "view to" distributing them depends on whether one had "investment intent" or intended only to sell the shares. See, e.g., Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 213 (3d Cir. 2006) (citing HAZEN, LAW OF SECURITIES REGULATION § 4.27[3] (6th ed. 2011)).

Verdmont argues that the broker's exemption applies on the face of the pleadings, or alternatively invites this Court to convert the motion into one for summary judgment and consider its due diligence efforts to scrutinize the transactions. Neither argument is persuasive. First, the Amended Complaint plausibly alleges that Verdmont's clients were underwriters by way of the sham transaction theory. Second, this Court cannot conclude on the basis of the pleadings whether Verdmont's inquiry of its clients or their transactions was reasonable given their volume and timing, and the fact that they were coordinated across multiple entities holding accounts at Verdmont. What are the odds that "independent shareholders" around the globe would invest in such obscure enterprises and then decide—spontaneously and simultaneously—to sell their positions through the same Panamanian broker-dealer? Only fulsome discovery can answer this question. This Court declines to examine evidence of Verdmont's due diligence by converting the motion to one for summary judgment. Accordingly, Verdmont's motion for judgment on the pleadings based on its invocation of the broker's exemption is denied.

IV.    Disgorgement

Verdmont also argues that the SEC is not entitled to disgorgement of the proceeds generated from its clients' sales on a theory of joint and several liability. (ECF No. 111, at 22.)

Whether disgorgement is appropriate is entrusted to this Court's "broad discretion," <u>SEC v. First Jersey Secs. Inc.</u>, 101 F.3d 1450, 1474 (2d Cir. 1996), and depends on multiple factors, including Verdmont's relationship to its clients. As the Second Circuit recently held:

> [W]hen third parties have benefited from illegal activity, it is possible to seek disgorgement from the violator, even if that violator never controlled the funds. . . . Thus, ordering a violator to disgorge gain the violator never possessed does not operate to magnify penalties or offer an alternative to fines, but serves disgorgement's core remedial function of preventing unjust enrichment. District courts possess the equitable discretion to determine whether disgorgement liability should fall upon third parties or violators, a responsibility concordant with the district courts' broad discretion to assay disgorgement more generally.

<u>SEC v. Contorinis</u>, 743 F.3d 296, 304–05 (2d Cir. 2014).

Determining whether Verdmont might be jointly and severally liable for disgorgement of sales proceeds realized by its clients—before Verdmont has even been held liable for a securities violation—would be premature. Accordingly, Verdmont's application to preclude the SEC from seeking disgorgement of proceeds from sales executed by Verdmont's clients is denied.

CONCLUSION

As the "statutory guardian"[24] of the nation's financial markets, the SEC is imbued with enormous powers to protect the investing public. It can halt securities trades and seek to freeze—through its representations to a court—the assets of any institution. However, the SEC's canon of ethics cautions: "The power to investigate carries with it the power to defame and destroy." 17 C.F.R. § 200.66. Judges rely on the SEC to deploy those powers conscientiously and provide accurate assessments regarding the evidence collected in their investigations. In that way, the integrity of the regulatory regime is preserved.

---

[24] <u>SEC v. Management Dynamics, Inc.</u>, 515 F.2d 801, 802 (2d Cir. 1975).

This case reveals the dire consequences that flow when the SEC fails to live up to its mandate and litigants yield to the Government's onslaught.  During an ex parte proceeding to freeze assets, where the adversary process is not in play, the SEC has an obligation to timely alert the court to foreseeable collateral damage.  By overstating its case, the SEC can do great harm and undermine the public's confidence in the administration of justice.  And that damage can be compounded when financial institutions, anxious to appease a regulator, submit to unconscionable terms and permit their depositors' assets to be held hostage without seeking immediate relief from a court.  As this case demonstrates, these concerns are not hypothetical.

This lesson aside, the pleadings are not conclusive on Verdmont's involvement with the unlawful distributions alleged here.  Moreover, it is in the public interest for the SEC—exercising its power fairly and its resources efficiently—to follow where its plausible allegations lead.  Verdmont's motion for judgment on the pleadings is denied.

The Clerk of Court is directed to terminate the motion pending at ECF Nos. 89 and 103 and docket a copy of this Opinion and Order in SEC v. Norstra Energy Inc., No. 15-cv-04751 (S.D.N.Y. filed June 18, 2015).  The stay of discovery against Verdmont, ordered at ECF No. 131, is lifted.

Dated: November 10, 2015
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record via ECF.*