UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,  :
 :
                             Plaintiff, :    15 Civ. 4751 (WHP)
     v. :
 :    ECF CASE
NORSTRA ENERGY INC., GLEN LANDRY, :
and ERIC DANY, :
 :
                           Defendants. :
------------------------------------------------------------------x

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56(c), Local Rule 56.1, Defendant Eric Dany ("Dany") submits the following statement of undisputed facts:

**Parties other than Dany were responsible for the Norstra campaign.**

1.    William Kaitz ("Kaitz") owned and operated Full Service Media ("Full Service") the media company that runs investor awareness campaigns, and ran the Norstra campaign. (SEC Investigative Testimony of Dany, attached as Exhibit A, 46: 15-19; Kaitz Dep., attached as Exhibit B, 224: 19 to 225: 2, 10-17; 228; 9-20.)

2.    Arista Theme Limited, a British Virgin Islands company (Arista Theme), oversaw the Norstra investor awareness campaign through Full Service, with a budget of $4.1million. $3.54 million was paid to Full Service. (Exhibit B, 230: 23 to 231: 8; 254: 8-14.)

3.    Kaitz Exhibit 30 is the terms and conditions for the relationship between Full Service and Arista Theme relating to the Norstra campaign. (Exhibit B, 234: 21 to 235: 7, 16-18; 243: 8-11; Exhibit 30 to Exhibit B, FSM0003794-3795, attached as Exhibit C.)

4.    Kaitz was contacted by Arista Theme to handle the Norstra campaign and Kaitz agreed to take on the project. (Exhibit B, 20:8-16; 21: 19-21.)

1

5.      Full Service entered into a written agreement with Arista Theme and was paid approximately $700,000.00 for its work in the campaign. Kaitz/ Full Service's role was to facilitate introductions that would help create the copy for the campaign, serve as the email address broker for the campaign and to ensure digital and print deliverability to the readers. (Exhibit B, 22: 2-4, 20-25; 23: 1-12; 28: 2-12; Agreements between Full Service and Arista, attached as Exhibit D.)

6.      One of Kaitz's goals was to ensure that the campaign email actually arrives into the recipients email in box. (Exhibit B, 243: 25 to 244: 6; 245: 18-22.)

7.      Arista Theme pays for the campaign and approves the campaign and its contents. (Exhibit B, 191: 11-22; 5/17/13 approval request from Kaitz to Arista, attached as Exhibit E; 5/21/13 approval from Arista to Kaitz, attached as Exhibit F.)

8.      Todd Weintz ("Weintz") was the copywriter who drafted the Norstra materials; he was not hired by Dany. (Exhibit A, 54: 18-21; 57: 7-9; Exhibit B, 24: 3-14.)

9.      Weintz's role was to create the marketing piece. (Exhibit B, 24:25 to 25: 4.)

10.     Weintz wrote the statements and representations at issue in this case. (Exhibit A, 111: 4-7; 113: 8-13; SEC Investigative Testimony of Dany, 2/10/1, attached as Exhibit G, 130: 12-17.)

11.     Weintz wrote the email portion of the campaign and Scott Hasz ("Hasz") put the email into HTML language. (Exhibit A, 130: 2-4.)

12.     Kaitz is the person responsible for final approval of a document to become disseminated. (Exhibit A, 131: 24-25; 132: 8-19.)

13.     Only Kaitz could stop the Norstra campaign. (Exhibit B, 278: 17 to 279: 12; 283: 13-20.)

14. Kaitz managed the dissemination of the Norstra campaign materials. (Exhibit B, 278: 17 to 279: 12.)

15. Kaitz was in charge of all distribution and approvals for the Norstra campaign. (Exhibit A, 140: 11-25.)

16. Kaitz scheduled the release of the print piece and the email piece for the Norstra campaign. (Exhibit B, 279: 13-18.)

17. Kaitz received information for the campaign from Arista Theme and passed it along to Weintz to write the copy for the campaign. (Exhibit B, 288: 15-17; 289: 5-13.)

18. Hasz, who handled graphics, sought approval from Kaitz for the Norstra campaign email after Dany's involvement. (Exhibit B, 302: 9-20; Weintz Dep., attached as Exhibit H, 195: 2-16.)

19. Prior to distributing the Norstra campaign email piece that bore Dany's name, Kaitz did not check with Dany. (Exhibit B, 304: 9-14.)

20. Weintz was involved with the Norstra campaign before Dany became involved. (Exhibit H, 186: 18 to 187: 2.)

21. Kaitz engaged Weintz for copywriting for the Norstra campaign. (Exhibit H, 189: 5-12.)

22. Kaitz directed Weintz to communicate with Norstra's CEO, Glen Landry, regarding the Norstra campaign and to review Norstra's public filings. Weintz drafted copy based on his communications with Landry and on reviewing Norstra's filings. Neither actions came at Dany's direction. (Exhibit B, 68: 22 to 69: 2; Exhibit H, 190: 2-18.)

23. Kaitz directly provided Weintz information about Norstra to use in the copy and did not include Dany on the communication. (Exhibits. 2 – 6 to Exhibit H, attached as Exhibit I.)

24.     When Weintz began drafting copy, Dany had no input into the piece he was drafting. (Exhibit H, 190: 22 to 191: 1)

25.     The publisher, not Dany, is responsible for the accuracy of the information and representations used in the Norstra in the campaign. (Exhibit H, 207: 9 to 209: 21; Exhibits. 28 and 32 to Exhibit H, attached as Exhibit J.)

26.     Weintz provided Kaitz with drafts of the publication and did not include Dany on the communications. (Exhibit 7 to Exhibit H, attached as Exhibit K.)

27.     Kaitz instructed Weintz with regard to the Norstra campaign copy, both in form and substance, and repeatedly did not include Dany on the communications. (Exhibits 17 and 20 to Exhibit H; Exhibit 6 to Exhibit B, attached as Exhibit L.)

28.     Kaitz oversaw the form and substance of the copy of the Norstra campaign independent from Dany's involvement as the endorser. Kaitz informed Weintz who the Endorser was after Weintz drafted the Norstra campaign copy. (Exhibit 8 to Exhibit H, attached as Exhibit M.)

**Dany did not make the statements at issue about Norstra.**

29.     Dany publishes two financial newsletters sold by subscription; one called the Mutual Fund Prospector, the other called The Stock Prospector. (Exhibit A, 32: 10-14.)

30.     Dany's role was as an "endorser," providing his brand identity and image to the Norstra campaign. (Exhibit A, 61; 12-16; Exhibit B, 30: 23-25; Exhibit H, 201: 6-12.)

31.     Kaitz considered people other than Dany to act as the campaign endorser and if Dany refused to act as endorser, Kaitz could have engaged a different endorser. (Exhibit B, 280: 1-7; Exhibit H, 202: 1-4.)

32. If Dany refused to endorse the campaign. Kaitz had the option of using a different endorser. (Exhibit H, 202: 16-20.)

33. Kaitz's company, Full Service, paid Dany a total of $20,000.00 for the endorsement services in the Norstra campaign. (Exhibit A, 9: 1-10; Exhibit H, 193: 14-17.)

34. Other than the $20,000.00 Dany received, he received no payment for the Norstra campaign. (Exhibit B, 81: 4-6.)

35. Dany's goal for the Norstra campaign was to generate interest in his newsletter subscriptions. (Exhibit A, 94: 17-24; 150: 10-13.)

36. Kaitz did not tell Dany of Kaitz' purpose for the Norstra campaign. (Exhibit A, 150: 17-19.)

37. Dany was just a carrier of the information. The text that Dany wrote does not appear until page the second paragraph of page 14, beginning with the paragraph that says "As I said before," and Dany wrote page 15. He did not write the final page. The remainder, with minor edits was written by Weintz, along with Kaitz. Kaitz ultimately was responsible for whether the material is communicated to anyone. (Exhibit A, 125: 2-11; 135: 4-20.)

38. Exhibit 31 to Dany's testimony appears to be the final version of the mailer. (Exhibit A, 80: 10-16; Exhibit 31 to Exhibit A, attached as Exhibit N.)

39. Dany Testimony Exhibit 33 is a working copy of the email version of the campaign materials. It was a prior to final version that was not disseminated. (Exhibit A, 129: 4-9; 133: 4-15.)

40. Dany does not have a copy of the final email that would have been distributed and he does not know who would have a copy of it. (Exhibit A, 131: 12-17.)

41. The Nostra statements and representations at issue were not in Dany's newsletters; rather, they appeared in a campaign piece. (Exhibit A, 38: 21 to 39: 4; 45: 1-12.)

42. No statements about Nostra appeared in Dany's newsletters or on his website. (Exhibit A, 39: 16-21; 130: 5-8.)

43. The campaign piece was not sent to Dany's newsletter subscribers; indeed, Dany does not know to whom Kaitz sent the campaign materials. (Exhibit A, 39: 11-15 65: 10-11; 66: 12-22;  Exhibit 27 to Exhibit B, attached as Exhibit O.)

44. There were two disclaimers; one was Dany's for receiving $20,000.00 and one was from Kaitz and Full Service, stating, among other things, they had a $2 million advertising budget and that they paid for all fees, including printing, distribution, postage, Dany's fee and the copywriter's fee. (Exhibit A, 77: 17-25; Exhibit N.)

45. Dany did not have absolute final approval of the campaign materials before distribution. (Exhibit A, 86: 17-20.)

46. Dany and Weintz/ Full Service had no understanding or agreement regarding the terms of the campaign materials. (Exhibit A, 123: 20 to 124: 6.)

47. Dany did not have final approval on the campaign materials; Kaitz was responsible for final approval of a document to become disseminated. (Exhibit A, 131: 24-25; 132: 8-19.)

48. Exhibit 34 to Dany's testimony (Exhibit A) is another working copy of the campaign  email. It had a link to the longer campaign piece and Weintz wrote it. It would not have been disseminated because it lacks the required disclaimer. (Exhibit A, 137: 11-21; 138: 10-14.)

49. Exhibit 44 to Dany's testimony did not represent the final version. (Exhibit G, 103: 1-12, 24 to 104:7.)

50. After Dany reviewed the campaign material, it is forwarded to the person who controlled the campaign who made the decisions on what becomes of it. (Exhibit A, 139: 3-9.)

51. Dany had no conversations with Kaitz about what happened with regard to the Norstra campaign. Dany does not know when the email or the megalog was distributed and nobody told him it was distributed. (Exhibit A, 141: 1-24.)

52. Dany's "approval" means the proper use of his logo, proper use of the name on the advertisement, the proper use of his marketing materials, proper use of the disclaimer, and that the funds he received is properly disclosed. (Exhibit G, 66:15 to 67:5, 13-18: Exhibit H, 201: 18-23.)

53. The disclaimer says that Dany relies on representations made by Norstra and that Dany does not purport to provide an analysis of the company's financial position, operations or prospects and the campaign material should not be construed as a recommendation or an offer to sell or solicitation to buy any security. (Exhibit G, 67: 7-12.)

54. Part of the Norstra email campaign did not even involve Dany and for which he had no input. (Exhibit B, 277: 7-14; 316: 3-6.)

55. The campaign was Full Service's campaign and Full Service agreed to hold Dany harmless and indemnify him if any information in the Norstra campaign materials bearing his name are fraudulent or illegal. (Exhibit B, 38: 16-19; 287: 17 to 288: 14; Exhibit 2 to Exhibit B; Exhibit 33 to Exhibit H. (attached as Exhibit P).

          Respectfully submitted,

          KOPECKY SCHUMACHER
          BLEAKLEY ROSENBURG PC
          *Attorneys for Defendant*
          *Eric Dany*


         By: ___/s/ James L. Kopecky_____
           JAMES L. KOPECKY


Dated: June 17, 2016

James L. Kopecky
Daryl M. Schumacher
Kopecky Schumacher Bleakley Rosenburg PC
203 N. LaSalle, Suite 1620
Chicago, Illinois 60601
312-527-3966

Marisa Rauchway Sverdlov
Law Office of Marisa Rauchway Sverdlov, LLC
51 JFK Pkwy, First Floor West, Short Hills, NJ 07078
140 Broadway, New York, NY 10005

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on June 17, 2016, he caused the foregoing document to be served upon all counsel of record via the ECF filing system.


/s/  James L. Kopecky