# Exhibit 1

```
                                       28271 dany.eric 092313.txt
0001
  1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

  2    In the Matter of:
                                    )
  3    NORSTRA ENERGY              )    File No. NY-8939
                                    )
  4
       WITNESS:    Eric Dany
  5
  6    PAGES:      1 through 164

  7    PLACE:      Securities and Exchange Commission
                   3 World Financial Center
  8                New York, New York 10281
  9
       DATE:       Monday, September 23, 2013
 10
           The above-entitled matter came on for investigation,
 11    pursuant to notice, at 9:58 a.m.
 12

 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
0002
  1    APPEARANCES:
  2
  3    On behalf of the Securities and Exchange Commission:
  4
  5        CHRISTOPHER CASTANO, ESQ.
  6        YITZCHOK KLUG, ESQ.
  7        WAYLON BRYSON, INTERN
  8        Securities and Exchange Commission
  9        3 World Financial Center
 10        New York, New York  10281
 11
 12    On behalf of the Witness:
 13
 14        JAMES KOPECKY, ESQ.
 15        Kopecky, Schumacher & Bleakley, P.C.
 16        203 N. LaSalle Street, Suite 1620
 17        Chicago, Illinois 60601
 18
 19
 20
 21
 22
 23
 24
 25
0003
  1
                                    Page 1
```

```
                              28271 dany.eric 092313.txt
16   are no longer in your possession or control?
17        A    All the documents I have a copy of and my
18   attorney has a copy of.
19        Q    Just so the record is clear I want to make sure
20   you understood the question, there might have been and I
21   don't know if there was or was not documents that you
22   received months and months ago that you didn't retain that
23   might have been responsive to the subpoenas, Norstra
24   Exhibits No. 28 and 29.
25        A    Yes, sir.
0018
 1        Q    Are you aware of any documents that might have
 2   been just deleted by yourself, maybe it's an e-mail that
 3   you received that might have been responsive to the
 4   subpoenas?
 5        A    Prior to the subpoena, yes, sir.
 6        Q    Can you tell me about that.
 7        A    Yes, sir.  My Microsoft Outlook e-mail box, I
 8   get about 100 or more e-mails a day.  I have found when
 9   the inbox goes above 1,000 individual items it has caused
10   me trouble and I had to have it repaired several times and
11   lost files, so I delete hundreds of files on a regular
12   basis.
13        Q    So it is possible that there were responsive
14   e-mails that are no longer in your possession and control?
15        A    Prior to the subpoena, yes, sir.
16        Q    And we're going to get to some further
17   questions later, I take it, are there e-mails that you do
18   retain?
19        A    Yes, sir.
20        Q    Maybe we'll go into those areas later but
21   typically can you just tell me right now what e-mails you
22   might retain.
23        A    I try to retain e-mails that I think are
24   substantive to the project, things that are conversational
25   in nature or multiple iterations of things, I'll keep the
0019
 1   current one typically and not the prior ones.
 2             BY MR. KLUG:
 3        Q    From what I remember and I don't want to get
 4   specific at this point, there were very few e-mails
 5   produced in this production.  Is that right?
 6        A    Yes, sir.
 7        Q    Maybe five or less, around five.
 8        A    Yes, sir.
 9        Q    Do you have any idea of how many e-mails might
10   have been responsive that are not here?
11        A    I'd like to answer that with two statements, if
12   I may.  First of all, at best it would be a guess, there
13   were not many e-mails required in this campaign for
14   whatever reason, I would guess 100 maybe at best.  The
15   second part is, it probably doesn't mean anything, my
16   submissions for this were very, very similar to my prior
17   four SEC submissions as far as numbers of documents and
18   content, from my perspective.
19        Q    You mentioned just now, I certainly don't want
20   to put words in your mouth, there were approximately 100
21   e-mails you're guessing that might have been responsive
22   that you no longer retain.  Do you know who these e-mails
23   were from?
24        A    Sure.
25        Q    Who were they from?
0020
                                 Page 8
```

```
                            28271 dany.eric 092313.txt
 1          A     I received e-mails from Mr. Kevin Finn, I
 2    received e-mails from the copywriter, Mr. Todd Weintz, I
 3    received e-mails from Mr. Bill Kaitz who was -- I forget
 4    the name of his media company, New Media I believe, there
 5    were e-mails from the graphics artist who dealt with --
 6    there may have been e-mails that dealt with the HTML, the
 7    e-mail campaign.
 8          Q     What is HTML?
 9          A     HTML for the making of the online versions of
10    the campaign materials.  Typically with the online
11    versions I am sent a link of the copy as it appears on the
12    website for my review and that gentleman's name is Scott
13    Haze.  There were a number of e-mails with Mr. Kaitz, the
14    graphics artist which I did not list as I did not know
15    her, I didn't keep any records of who she was but she
16    helped with the preparation of pages 14 and 15 of the
17    direct mail piece working with me in order to get the
18    marketing section and graphics correct.
19                BY MR. CASTANO:
20          Q     Mr. Dany, we're going to explore some of this a
21    little bit later but before we move on, I'd just like to
22    do some more background.
23          A     Yes, sir.
24          Q     The residences you listed in your background
25    questionnaire, do you own any of them, any of those homes?
0021
 1          A     Yes, sir.
 2          Q     Do you have mortgages on those homes?
 3          A     Yes, sir.
 4          Q     Currently?
 5          A     Yes, sir.
 6          Q     Are you the title holder?
 7          A     My wife and I.
 8          Q     Do you own any cars, any automobiles?
 9          A     Yes.
10          Q     How many cars do you own?
11          A     Three -- I'm sorry, four.
12          Q     Do you have any pensions?
13          A     With John Deere.
14          Q     Besides John Deere?
15          A     I have a John Deere 401(k) savings plan
16    invested and I have some IRA's.
17          Q     Besides the pension and the IRA's do you own
18    any stocks or equities?
19          A     Yes, sir, I do.
20          Q     Back of the envelope how many equities do you
21    currently own?
22          A     Would you clarify the question, please.
23          Q     Do you own thousands of equities or do you own
24    just a few hundred equities or maybe even less than that?
25          A      Probably less than that, I'm not sure what the
0022
 1    number would be, twenty maybe.
 2          Q     I'll have some more questions about that
 3    shortly.  Do you have a safe in your home?
 4          A     Yes, I do.
 5          Q     Do you store cash?
 6          A     No, sir.
 7          Q     Do you store cash anywhere?
 8          A     I have $500 in my underwear draw.
 9          Q     Besides that?
10          A     No, sir.
11          Q     Does anyone store cash -- I'm sorry.
                               Page 9
```

```
                              28271 dany.eric 092313.txt
 7   record at 11:06 a.m.
 8              (Whereupon, a recess was taken.)
 9              MR. CASTANO:   We're back on the record at
10   11:15 a.m.  Mr. Dany, while we were off the record were
11   there any substantive conversations between the Commission
12   staff and yourself?
13              THE WITNESS:   No, sir.
14              MR. CASTANO:   Do you wish to change or augment
15   any answer that you gave prior to us going off the record?
16              THE WITNESS:   No, sir.
17       Q      Before we went off the record we were talking a
18   little bit about your newsletters and we were talking
19   about your advertising piece and just so the record is
20   clear, for the year 2013 did the Stock Prospector only do
21   one advertising piece?
22       A      Yes, sir.
23       Q      And for the year 2012 approximately how many
24   advertising pieces did the Stock Prospector do?
25       A      Four or five.
0045
 1
 2       Q      Am I calling it the right name, an advertising
 3   piece?  Do you refer to it as something else?
 4       A      Well I call it a megalog.
 5       Q      Megalog?
 6       A      Megalog.
 7       Q      That's L-O-G.
 8       A      Yes.
 9       Q      Why do you call it a megalog?
10       A      Well in the advertising direct mail industry
11   that's what multiple page advertisements like that that
12   are mailed are called, megalogs.
13       Q      You mentioned you did four or five megalogs in
14   2012, do you know the names of the companies?
15       A      Sir, I'd like to correct that if I may.
16       Q      Sure.
17       A      I said I did four or five campaigns last year
18   that may have been a combination of e-mail and/or direct
19   mail.
20       Q      Can you just break that down for me so I
21   understand.
22       A      Some campaigns are e-mail only, they go out to
23   e-mail lists.
24       Q      That's megalogs that would go out to e-mail
25   lists.
0046
 1       A      Yes.  I'm sorry.
 2       Q      I'm confused too, the record is what the record
 3   is but let's just go through it very slowly.  You
 4   mentioned and tell me if I'm wrong here that there were
 5   four or five megalogs, let's back up.
 6       A      I'm sorry.
 7       Q      The Norstra, how I described it or you
 8   described it earlier, advertisement, is that a megalog?
 9       A      Yes, sir.
10       Q      And was that sent by a subscriber list by mail?
11       A      No, sir.
12       Q      Are you sure about that?
13       A      May I explain.
14       Q      Sure.
15       A      Mr. Kaitz was in charge of the media company
16   who distributed the megalog.
17       Q      For?
                                                 Page 19
```

```
                                28271 dany.eric 092313.txt
18       A     I'm sorry?
19       Q     For Norstra.
20       A     For Norstra, yes, the Norstra megalog.  I know
21  that Mr. Kaitz, that it was distributed by e-mail because
22  we had e-mail created, produced, and I know that it was
23  distributed by direct mail because we had direct mail
24  produced and I received subscriptions from the direct mail
25  piece.  Now where other campaigns last year would differ
0047
 1  is they may have only gone out by e-mail and there would
 2  be no direct mail advertising piece.
 3       Q     Did you work with Mr. Kaitz on those?
 4       A     I don't believe so.
 5       Q     Did you work with other individuals?
 6       A     Yes, sir.
 7       Q     And you believe -- you're not entirely certain
 8  but you believe those megalogs were only sent by e-mail
 9  for 2012?
10       A     No, I don't recall, they could have been sent
11  by e-mail.
12       Q     Do you recall the names of the equities or
13  stocks that were promoted in those 2012 megalogs?
14       A     I don't remember.
15       Q     Do you have a copy of those 2012 megalogs?
16       A     Yes, sir.
17             MR. CASTANO:    Jim, that would be another thing
18  that we would request, the copies.
19       Q     Do you recall whether you worked with Mr. Kaitz
20  on those four to five?
21       A     I don't believe I did.  I worked with Mr. Kaitz
22  one time previously and I'm not sure what campaign that
23  was.
24       Q     Was that in 2012 or 2011?
25       A     I don't recall.
0048
 1       Q     Was it before 9/11, after 9/11?
 2       A     After 9/11.
 3       Q     Is there anything that you can recall that
 4  would refresh your recollection as to when you first
 5  worked with Mr. Kaitz?
 6       A     My files would help.
 7       Q     So there might be a document in there that
 8  indicates when you first worked with Mr. Kaitz?
 9       A     Yes, sir.
10       Q     Who is Mr. Kaitz?
11       A     I don't know, he's a client.  I've never met
12  him, I've talked to him three or four times, less than a
13  dozen times on each campaign.  We've worked twice.
14       Q     He's a client of your newsletter.
15       A     Well he's -- my newsletter business, Prospector
16  Newsletters, I produced the newsletters and through
17  advertising pieces like the Norstra megalog we garner
18  additional subscribers and I typically call those investor
19  relation campaigns.
20       Q     I just want to make sure the question was
21  answered.  Is Mr. Kaitz a client of yours?  You mentioned
22  earlier he's a client.
23       A     He pays me.
24       Q     He pays you for the newsletter subscription or
25  he pays you for the megalog?
0049
 1       A     He pays me for -- he paid me for the
 2  endorsement services of the megalog.  Do you mean on
                                  Page 20
```

```
                       28271 dany.eric 092313.txt
10    conversation with you regarding the Norstra campaign prior
11    to him sending you e-mails?
12         A     If you're asking about Mr. Kaitz, he did not do
13    that.  I had no conversations with Mr. Weintz about the
14    Norstra campaign until I asked him for some proof of the
15    statements he made.
16         Q     Just so I'm clear because I'm not, the record
17    speaks for itself.
18         A     I apologize.
19         Q     It's okay, you don't have to apologize, Mr.
20    Dany.  How did Mr. Weintz become involved with you for
21    purposes of the Norstra campaign?
22         A     I would have to make a a presumption here and
23    that was that Mr. Kaitz or Mr. Finn told Mr. Weintz that I
24    was going to be the endorser.  He was probably working on
25    the copy for several weeks and they didn't know who the
0057
 1    spokesperson was going to be.  Mr. Finn represents a dozen
 2    or so folks like myself who are capable of doing the
 3    endorsement.  So someone told Mr. Weintz, I don't know
 4    who, that Mr. Dany would be doing the endorsement and
 5    probably told him to send Eric the e-mails and the copy
 6    for his review.
 7         Q     Just so the record is clear, you didn't hire
 8    Mr. Weintz to be the copywriter for the Norstra campaign.
 9         A     No, sir.
10               MR. CASTANO:   I'm marking this as Norstra
11    Exhibit No. 30.
12               (Norstra Exhibit No. 30 marked
13                for identification.)
14               MR. CASTANO:   Here's a courtesy copy.  I'm
15    showing the witness what has just been marked as Norstra
16    Exhibit No. 30.
17         Q     Please take a moment to review.
18               (Witness perusing document)
19         A     Yes, sir.
20         Q     Mr. Dany, have you seen Norstra Exhibit No. 30
21    before?
22         A     Yes, I have.
23         Q     Do you know what Norstra Exhibit No. 30 is?
24         A     This is my agreement with Mr. Kaitz.
25         Q     Is it between you and Mr. Kaitz or you and an
0058
 1    entity?
 2         A     It's Full Service Media signed by Mr. Kaitz.
 3         Q     Does this refresh your recollection as to Mr.
 4    Kaitz's entity?
 5         A     Yes, sir.
 6         Q     What is the name of Mr. Kaitz's entity?
 7         A     Full Service Media LLC.
 8         Q     I notice there appears to be -- the second page
 9    appears to be signed only by one party.  Do you recall
10    ever signing this agreement?
11         A     No, I just put it in my file.
12         Q     Do you recall ever signing this agreement,
13    providing it to Full Service Media or Mr. Kaitz?
14         A     No, sir.
15         Q     Do you believe you did sign this agreement or
16    you didn't?
17         A     I did not.
18         Q     Did Mr. Kaitz ever ask for you to sign it?
19         A     No, sir.
20         Q     Do you know how you received this agreement?
                              Page 24
```

```
                               28271 dany.eric 092313.txt
21      A    It was by e-mail.
22      Q    Do you still have that e-mail to the best of
23 your knowledge?
24      A    I don't know if we produced it or not.  If I
25 had it, I produced it, if I didn't --
0059
 1      Q    I would ask to the extent this e-mail does
 2 exist --
 3      A    I can look for it.
 4      Q    You can look for it.  I want to direct your
 5 attention to line 6, Fee and Payment, "The client agrees
 6 to pay $10,000 for a campaign effort."  Does that
 7 accurately reflect what you thought you would receive for
 8 the campaign?
 9      A    Yes.
10      Q    Were you going to also receive an additional
11 amount of funds?
12      A    No, sir.
13      Q    Did you receive $10,000 for any Norstra
14 campaign or did you receive $20,000?
15      A    It ended up that I received 20,000, this is an
16 agreement for the e-mail campaign.
17      Q    Is there an agreement for the mailing campaign?
18      A    I sent it to Mr. Kaitz several times and he did
19 not send it back.  I asked my agent, Kevin Finn, to
20 request it from Mr. Kaitz and we never received it.
21      Q    I want to direct your attention to the third
22 line, Final Approval, "Eric Dany maintains the right of
23 final approval of all copy and design."
24      A    Yes, sir.
25      Q    Is that an accurate statement?
0060
 1      A    Yes, sir.
 2      Q    Did you review the e-mails before they went
 3 out?
 4      A    Yes, sir, I would have made edits to them.
 5      Q    And did you give "final approval" to the e-mail
 6 before it went out?
 7      A    Yes, sir.
 8      Q    Did you give final approval to the megalog that
 9 went out?
10      A    Yes, sir.
11      Q    I want to direct your attention to paragraph
12 10, "This agreement shall be governed by the laws of the
13 State of Illinois."
14      A    Yes, sir.
15      Q    Do you know if that refreshes your recollection
16 as to where Mr. Kaitz is located?
17      A    That's where I reside, sir.
18      Q    But you don't know the state --
19      A    I don't know where Mr. Kaitz resides.
20      Q    I direct your attention to the number 9, "Eric
21 Dany shall not trade, buy, sell or hold securities of the
22 future company."  Did you ever hold any Norstra
23 securities?
24      A    No, sir.
25      Q    Did you ever sell Norstra securities?
0061
 1      A    No, sir.
 2      Q    Did you ever indirectly or directly sell
 3 Norstra securities?
 4      A    No, sir.
 5           BY MR. KLUG:
                                         Page 25
```

```
                              28271 dany.eric 092313.txt
 6      Q    You may have asked this already and I may have
 7  missed it, I apologize if I'm being repetitive.  You were
 8  hired just to do e-mail distribution of this.
 9      A    Initially.
10      Q    And you actually sent the e-mails out?
11      A    No, sir.
12      Q    So you were acting as the spokesperson.
13      A    Yes, sir.
14      Q    What does that entail?
15      A    I provide my brand and my image as editor of
16  the Stock Prospector Newsletter to the campaign.
17      Q    Okay.  Again you do review all the material?
18      A    Yes, I look at it and read it.
19      Q    And did you have questions on the Norstra
20  material?
21      A    Yes, I did.
22      Q    We'll come to that in a moment.
23           BY MR. CASTANO:
24      Q    I can take Norstra Exhibit No. 30 back.  Thank
25  you.  Let me ask you this, at some point Mr. Weintz begins
0062
 1  communicating with you by e-mail regarding the content of
 2  the Norstra megalog.  Is that correct?
 3      A    It would have been the e-mail first and then
 4  the megalog, yes, sir.
 5      Q    And did you -- do you recall how many times he
 6  communicated with Mr. Weintz by e-mail and he communicated
 7  with you?
 8      A    Not very many, I don't recall.
 9      Q    More than ten?
10      A    Probably a dozen times, less than a dozen,
11  between both, the e-mail and the direct mail.
12      Q    When you received the e-mail concerning the
13  Norstra campaign from Mr. Weintz concerning the e-mail
14  distribution, what did you do with that information?
15      A    I read the copy, I looked at it and -- my
16  memory isn't totally that good.  I believe I asked him for
17  some supporting documents of the information that he had
18  provided.
19      Q    Did he provide you with supporting documents?
20      A    Yes.
21      Q    Do you have the e-mails from him?
22      A    No, sir.
23      Q    They weren't produced to us.
24      A    I produced one that talked about the supporting
25  documents, yes.
0063
 1      Q    Do you recall how many supporting documents you
 2  asked for?
 3      A    What I sent him was a copy of the piece which I
 4  believe was a PDF file and I asked for -- in copywriter
 5  parlance it's called proof of the statements and I asked
 6  him on several sections specific items not every element
 7  in the document but in several of them I asked him for
 8  what his proof was and he sent me back an e-mail that
 9  described where he found the information.
10      Q    Did you produce that e-mail?
11      A    Yes.
12      Q    Are there any other e-mails?
13      A    There probably would have been, yes, sir.
14      Q    Besides the proof that Mr. Weintz provided you,
15  did you do any other independent verification to determine
16  whether the information was accurate?
                               Page 26
```

28271 dany.eric 092313.txt
```
17       A     Yes, sir, I believe -- I had a phone
18  conversation with Mr. Weintz, I had additional questions
19  and I called him and asked him where I could find various
20  elements in various pieces and he talked me through some
21  of them and directed me to some websites for others.   I
22  believe we talked about half an hour -- twenty minutes to
23  half an hour about various elements of the piece.
24       Q     Do you recall when that conversation was?
25       A     No, sir.
0064
 1       Q     Do you recall what telephone number you made
 2  that phone call on?
 3       A     Well it would have been in my office, so it was
 4  either the Prospector Newsletter phone or it was my cell
 5  phone.
 6       Q     Do you believe that was early on in the
 7  campaign?
 8       A     Yes, sir.
 9       Q     So if we were to go back through phone records,
10  we would see a conversation of approximately twenty or
11  thirty minutes?
12       A     Yes, sir.
13       Q     I think you mentioned, I don't want to put
14  words in your mouth, that he told you you could go to
15  certain places.
16       A     Yes.
17       Q     What places?
18       A     He directed me to the Norstra website and he
19  either sent me a couple power point files or he directed
20  me to the website where I downloaded them and those were
21  the presentations that we produced.
22       Q     Besides the website and your conversations with
23  Mr. Weintz, what other steps did you take to verify the
24  information that would be contained in the e-mail and
25  megalog?
0065
 1       A     I visited the Yahoo financial website, I looked
 2  at the company's press releases that are listed there, I
 3  went to the company's website, reviewed it, I think I did
 4  a couple Google type searches on a couple of the items.
 5       Q     Anything else?
 6       A     No, sir.
 7       Q     Did there come a time that you agreed that the
 8  e-mail should go out?
 9       A     Yes.
10       Q     Do you know where those e-mails were going?
11       A     No, sir.
12       Q     Did you ask Mr. Weintz where they were going?
13       A     No, sir.
14       Q     Why didn't you ask Mr. Weintz where those
15  e-mails were going?
16       A     He was in charge of distribution.
17       Q     You didn't ask him?
18       A     No.
19       Q     In terms of the megalog, the mailer that went
20  out, do you know where those went out?
21       A     I know -- the question was?
22       Q     The megalog, the mailer for the Norstra
23  campaign, do you know where they were mailed to?
24       A     They were mailed to subscriber lists.
25       Q     Your subscriber lists for?
0066
 1       A     They were mailed to multiple subscriber lists,
```
Page 27

```
                          28271 dany.eric 092313.txt
 2   the reason I know that is because I had to sign approvals
 3   to -- in the list brokerage industry you often times have
 4   to give a reciprocal agreement that they can rent your
 5   list and list owners have a legal document that says you
 6   can't in essence re-use their names, steal their names, do
 7   that kind of stuff for it.  So there are a lot of list
 8   brokers and list owners who require the signing of those
 9   documents.
10        Q     How many did you sign?
11        A     Approximately ten to fifteen.
12        Q     Did you get to see who the actual subscribers
13   were to those news lists?
14        A     No, sir.
15        Q     Did you get a copy of those news lists meaning
16   the subscribers to the news lists?
17        A     No.
18        Q     Were you informed who the people were on the
19   news lists?
20        A     No.
21        Q     Was the megalog mailed to your news list, your
22   subscriber list?
23        A     Well I have a direct mail list of names, about
24   150,000 names that are on it.
25        Q     I'm sorry, I thought your testimony earlier was
0067
 1   that you have 150.  What am I getting wrong?
 2            MR. KOPECKY:   There's completely different
 3   things in there, there's subscribers and then there's
 4   direct mail lists, there's a whole business of lists and
 5   he's also in that.
 6        Q     Just so I'm clear and the record is clear, your
 7   newsletter that you publish monthly goes to 150
 8   subscribers.  Is that correct?
 9        A     The Stock Prospector does, yes, sir.
10        Q     And you're about to describe something else
11   now.
12        A     Yes, sir.  I have a list that I have
13   accumulated over the last fifteen years of publishing of
14   people who have inquired about my newsletter, have
15   subscribed to my newsletter and I have purchased a list or
16   two and added names to my direct mail list.  Now that list
17   is rented out much the same as Mr. Kaitz rented various
18   lists to distribute the megalog.  He also rented a portion
19   of my mail list.
20        Q     Let's back up for a second.  The fifteen years
21   that you've acquired this list, it's a different list than
22   the 150 subscribers.  Is that correct?
23        A     Yes, except that -- and at this point it is
24   possible that a couple of my longer term subscribers had
25   been added to the direct mail list.
0068
 1        Q     And that's your direct mail list.  Is that
 2   correct?
 3        A     Yes.
 4        Q     And you said you have approximately 150
 5   individuals on that direct mail list.
 6        A     150,000.
 7        Q     150,000.  Where is that direct mail list?
 8        A     It's managed by a company called Macromark.
 9        Q     Do you have a copy of that?
10        A     The file?
11        Q     Yes.
12        A     Probably.
                                 Page 28
```

                                28271 dany.eric 092313.txt
13             MR. CASTANO:    Jim, that's also another --
14   we're going to want a list of the 150,000.
15       Q     It's called Macromark.  Can you spell that.
16       A     Let me check -- M-A-C-R-O-M-A-R-K, Macromark.
17       Q     Where are they located?
18       A     New York.
19             MR. KLUG:   Is it two words or one?
20             THE WITNESS:   I have it as one.
21       Q     Do you have a phone number for them?
22       A     I do, the owner of the company is David Klein,
23   845 230-6313, they're in Brewster, New York, that's his
24   direct number, their general number is 845 230-6300.
25       Q     Is this a list, this direct mail list of
0069
 1   150,000, a list that you've compiled and given to
 2   Macromark?
 3       A     Yes.
 4       Q     And then they are responsible for --
 5       A     Management of it.
 6       Q     So the record is clear, was the megalog for the
 7   Norstra campaign given to Macromark for distribution to
 8   the 150,000 direct mail list subscribers you have?
 9             MR. KOPECKY:    I'm just going to object
10   because I think you're still missing something.
11       Q     Let's get this straight.  The direct mail list
12   of 150,000 people is a list of people you've accumulated
13   over the course of the last fifteen.  Is that correct?
14       A     Yes, sir.
15       Q     And that 150,000 people list, the direct mail
16   list, is something you have in your possession or control
17   meaning it's something you have in your files at home or
18   it's a file that's at Macromark.
19       A     Yes.
20       Q     Then the question is simple, was or was not the
21   megalog for the Norstra campaign sent to those 150,000
22   people, the list you've accumulated for the last fifteen
23   years?
24       A     It was sent to a portion of them.
25       Q     Do you know what portion it was sent to?
0070
 1       A     No, sir.
 2       Q     Was it 10,000 people?
 3       A     We produced the payments from Macromark for the
 4   use of that.  If we looked at that document, we would tell
 5   me how many names were rented.
 6       Q     And is there a record of the individuals it
 7   went to from Macromark?
 8       A     I believe Macromark would retain some
 9   segmentation of that information.
10       Q     Did you direct Macromark to only produce it to
11   certain people on that 150,000 person list?
12             MR. KOPECKY:    Objection, it doesn't -- you're
13   still missing the way it works.
14       Q     Why don't you tell me how it works.
15       A     Mr. Kaitz was in charge of all the
16   distribution.
17             MR. KOPECKY:    Actually first let's start with
18   what Macromark does.
19       A     Macromark is a list broker, they handle
20   hundreds, if not thousands, of people's lists, businesses
21   lists.  They have the repository of the names.  If someone
22   comes to them and requests to rent Eric Dany's Stock
23   Prospector list, they will ask for 50,000 names, 100,000
                                 Page 29

```
                         28271 dany.eric 092313.txt
24    names or the full list, whatever it is.  We rent it at a
25    price of $195 per thousand, the list is -- if they ask for
0071
 1    25,000 names, Macromark internally with their computer
 2    system strips off 25,000 names and they send that out to a
 3    third party independent IT processor where all of the mail
 4    lists that are used in the mailing are combined, they
 5    usually go through several options, one called the Merge
 6    Purge which eliminates the duplicate names, they can take
 7    out deceased, they can take out any number of sorts and
 8    then they usually run it through NOCA which updates, its
 9    U.S. Postal Office thing that updates all the names and
10    addresses to current.
11         Q    Did Mr. Kaitz approach you about renting
12    certain names from Eric Dany's list at Macromark?
13         A    Mr. Kaitz didn't, it came from his list, the
14    person he used as a list broker, that's Angela Leonard,
15    she has a new last name, of Going Postal Solutions.
16         Q    So Ms. Leonard approached you about using Eric
17    Dany's list at Macromark?
18         A    No, sir, that's not entirely true.
19         Q    Tell me how you were involved with, if at all,
20    Norstra's megalog being used through any of the Eric Dany
21    lists of 150,000 subscribers.
22         A    Unknown to me at the time Angela at Going
23    Postal Solutions had requested Macromark the use of some
24    of my names.  Macromark did not inform me at the time that
25    they were going to be used in the Stock Prospector Norstra
0072
 1    campaign.  So she rented the names and added them to the
 2    pile of names that she had rented from other people,
 3    typically there's twenty or more mail lists that are
 4    combined to produce a mailing.
 5         Q    And no one at Macromark told you this was
 6    happening?
 7         A    I didn't know it until I received a copy of the
 8    current month's statement with checks on it and I flipped,
 9    I don't pay much attention to it, I take the check off the
10    top, I flipped through it to see who has rented it and
11    what my future income may be, next month's income and
12    there was an Eric Dany Norstra campaign.
13         Q    Has this ever happened before?
14         A    It probably has.
15         Q    Did you reach out to Macromark and ask them why
16    this happened without your consent?
17         A    No, I think probably -- two things happened at
18    Macromark recently and one was that David Boyd who was my
19    contact there who managed my list accepted a new job and
20    there was a new person that took over.  Now whether she
21    assumed that any Stock Prospector campaign had my approval
22    or not, I don't know.  If David Boyd told her that any
23    campaign would have my approval --
24         Q    Was there any document at Macromark that said
25    you needed to approve any use of your list?
0073
 1         A    I don't know what their internal policies are.
 2         Q    Did you expressly tell anyone at Macromark that
 3    "you can't use my list unless you have my consent"?
 4         A    No, I think as a practice they send me samples
 5    of what is going out and I approve it.  They also send me
 6    samples of what is going out and I approve it, they also
 7    send me the dollar amount that the customer is willing to
 8    pay for it.
```

```
                            28271 dany.eric 092313.txt
 9        Q     And that didn't happen here?
10        A     That did not happen here.
11        Q     They would do that by e-mail?
12        A     Yes, sir.
13        Q     Does that happen every single time, they'll
14   send you an e-mail detailing the amount?
15        A     Except my own, when it's a Stock Prospector
16   apparently.
17        Q     So this has never happened before, this is the
18   first time to your knowledge that they didn't reach out to
19   you and tell you this was happening.
20        A     No, on other Stock Prospector mailings they
21   probably did not contact me.
22        Q     And we're talking about the megalogs, we're not
23   talking about your regular mailings.
24        A     Right.
25        Q     So there's a possibility but you're not 100
0074
 1   percent certain that in the past concerning megalogs they
 2   might not have contacted you.
 3        A     I don't believe it's their policy to contact me
 4   when it is -- my mailer -- excuse me, let me gather my
 5   thoughts.  In the direct mail industry my Stock Prospector
 6   newsletter is known as the Carrier and if the Carrier is
 7   the list owner's name, I don't believe Macromark in the
 8   forms me or the Carrier, that my names are being rented
 9   because I believe they assume that I know that my list is
10   being rented.  In this case I did not it was being rented.
11        Q     Because it had your name on it.
12        A     I was the carrier.
13        Q     The Norstra megalog had your name on it.
14        A     Yes.
15        Q     And that might be one reason why they didn't
16   reach out to you.
17        A     Yes.
18        Q     When you found out that this had been done, did
19   you reach out to Macromark and have a conversation with
20   them?
21        A     No, sir.
22        Q     Did you disapprove afterwards in any way of
23   your list at Macromark being used for the megalog Norstra
24   campaign?
25        A     No, sir.
0075
 1        Q     Did you have any conversations with anyone at
 2   all be it Macromark or Mr. Weintz or Mr. Kaitz voicing any
 3   concerns that parts of your Macromark list was being used
 4   for the megalog Norstra campaign?
 5        A     None whatsoever.
 6        Q     Sitting here today do you know what portion of
 7   the Macromark list was used?
 8        A     Only in quantity of names.
 9        Q     Approximately how many?
10        A     I think it was 50,000.
11        Q     Putting aside your list, are you aware of other
12   mail lists being used besides the 50,000 at Macromark?
13        A      Yes, sir, I had to sign off on the approvals of
14   several other lists.
15        Q     Sitting here today do you know or might not
16   know, I think we asked this earlier, I just want to make
17   sure, whether the 50,000 approximately that was used at
18   Macromark concerning your list of 150,000, if the actual
19   people so to speak that it was actually mailed to or
                                Page 31
```

```
                                  28271 dany.eric 092313.txt
20   entities was retained by Macromark?
21        A     I believe they do that as a business practice
22   in case there's a subsequent mailer so they could if they
23   want different names, there are still 100,000 names they
24   could choose from.  They must know how to segregate
25   theirs.
0076
 1        Q     But you don't know for certain.
 2        A     No, sir.
 3        Q     Besides Mr. Kaitz did you have any other
 4   conversations and besides Ms. -- was it Angela did you
 5   say?
 6        A     Angela Leonard Saltzman I think.
 7        Q     Ms. Leonard Saltzman did you have any other
 8   conversations at all broadly defined concerning the
 9   megalog campaign for Norstra?
10        A     I may have talked to Mr. Finn about it.
11        Q     Anyone else?
12        A     No, sir.
13        Q     Did Mr. Finn provide you with any documents
14   concerning Norstra?
15        A     No, sir.
16        Q     Did you have any conversations with Mr. Finn
17   regarding the information about Norstra Energy?
18        A     No, sir.
19        Q     Do you know who paid the printing costs for
20   Macromark?
21        A     Macromark is not a printer.
22        Q     Do you know who paid the printing costs for any
23   of the news -- excuse me, any of the direct mail lists
24   that went out for the Norstra campaign?
25        A     Full Service -- I presume Full Service Media
0077
 1   did because it was in their disclaimer.
 2        Q     Did --
 3        A     Do I know they paid -- no, I don't.
 4        Q     Do you know who paid for the actual postage?
 5        A     No, sir.
 6        Q     Do you think it might be Full Service Media?
 7        A     I believe it would be, he was the distributor,
 8   yes.
 9        Q     And you disclosed that in your disclaimer that
10   Full Service Media is paying the postage?
11        A     It was in his, Full Service Media disclaimer.
12        Q     Where was that?
13        A     Page 614 or something.
14              MR. KLUG:  Are you saying the disclaimer that
15   you can look up the page in the megalog is put together by
16   Full Service Media?
17              THE WITNESS:  There were two disclaimers in
18   this megalog, one was mine for receiving the $20,000 total
19   in the campaign and all the rest of the stuff that goes
20   with it.  Mr. Kaitz and Full Service Media provided
21   another disclaimer that was in the piece and I believe
22   that in round numbers it said that they were handling an
23   advertising budget of two million dollars and it showed
24   that it had paid for the printing, the distribution, the
25   postage, my fee and the copywriter's fee, all the fees.
0078
 1        Q     Do you know where they got the two million
 2   dollars from approximately?
 3        A     I have no idea.
 4        Q     Did you ask any questions about where they got
                                Page 32
```

```
                              28271 dany.eric 092313.txt
 6         A    I didn't have any terms.
 7         Q    Do you have a copy of the e-mail that was sent
 8    out, the e-mail campaign?
 9         A    I produced basically our file.
10         Q    Do you have a copy -- we have a copy of the
11    megalog that was sent out.
12         A    Yes.
13         Q    Did you produce a copy of the e-mail that was
14    sent out as well?
15         A    We supplied those. Let me clarify, I don't
16    know that those were the actual e-mails that were sent
17    out, that was the copies of the creative that I reviewed.
18         Q    So the record is clear, we talked a little bit
19    this morning before we went on break, you reviewed Norstra
20    Exhibit No. 31, that's the megalog, before it went out.
21    Is that correct?
22         A    Yes.
23         Q    Did you have final approval for the Norstra
24    Exhibit No. 31, the megalog?
25         A    Could I clarify that.
0125
 1         Q    Sure.
 2         A    I am hired as a spokesperson for these
 3    campaigns, campaigns like Norstra, what I wrote in this
 4    campaign actually begins on page 14. As I said before, my
 5    name is Eric Dany and it is the marketing aspect and page
 6    15, I put together the subscription page. The rest of it
 7    with minor edits was written by Mr. Weintz. Mr. Katz also
 8    made edits to the creative and ultimately Mr. Katz is
 9    responsible for whether this is mailed or the e-mails go
10    out or whether it's not. I am the carrier of the
11    information.
12         Q    Just so the record is clear, this morning we
13    talked about you knew this would go out. Right?
14         A    I believed that it would.
15         Q    And in fact it did go out. Isn't that correct?
16         A    Yes.
17         Q    And you reviewed the information contained in
18    Norstra Exhibit No. 31 before it went out.
19         A    Yes, sir, I did.
20         Q    And just so we're clear, the name of the
21    document is entitled "Eric Dany Stock Prospector Main
22    Street Research." Is that correct?
23         A    That's your reference to it, sir. In previous
24    mailers and things it goes out under Eric Dany Stock
25    Prospector. I referred to my research as Main Street
0126
 1    Research, not Wall Street's. So the graphics artist
 2    simply inserted Main Street Research or the copywriter,
 3    excuse me, Mr. Weintz inserted that in there. It doesn't
 4    necessarily indicate in my opinion a different document or
 5    a different business or a different whatever.
 6         Q    Before Norstra Exhibit No. 31 was mailed to any
 7    potential investor, did you object to any of the content
 8    contained in Norstra Exhibit No. 31?
 9              MR. KOPECKY:   I'd just object to the form of
10    the question. I have an objection. Answer the question,
11    answer it as best you can. I object to the form of the
12    question as ambiguous and vague.
13              MR. CASTANO:   I don't think the question was
14    ambiguous and vague, I thought it was pretty clear.
15         Q    Let me ask it to you this way. Did you have
16    any conversations with anyone, Mr. Kaitz or Mr. Finn or
                                 Page 52
```

```
                          28271 dany.eric 092313.txt
17   Mr. Weintz, saying please remove certain information that
18   is contained in Norstra Exhibit No. 31?
19        A     Yes, there were edits made before it went out.
20        Q     The final version, Norstra Exhibit No. 31,
21   that's in front of you right now, did you object to any of
22   the information contained in there meaning did you have a
23   phone call with anyone or communications with anyone
24   saying "Hey, this went out and there's a misstatement in
25   there on page 5" or "there's a misstatement on the front
0127
 1   page, did you have any conversations with anyone after it
 2   went out about the accuracy of the information contained
 3   in it?
 4        A     I did.
 5        Q     Did you voice any concerns?
 6        A     I sent Mr. Weintz an e-mail and it had some
 7   questions on it.  I never heard back from Mr. Weintz.
 8        Q     Did you provide that e-mail to us?
 9        A     I didn't have it.
10        Q     What were those questions to your knowledge?
11        A     I don't remember, I think it was -- I don't
12   remember.  It was obviously not a serious concern.  If I
13   had had a serious concern, I would have talked to Mr. Katz
14   and told him to cancel the campaign which I have done on
15   other campaigns.
16        Q     Sitting here today with Norstra Exhibit No. 31,
17   did you have final approval of the content that's
18   contained in it regardless of who wrote it?
19        A     Yes.
20              MR. KOPECKY:    Same objection and it's been
21   asked and answered.
22              MR. CASTANO:    It has.
23              MR. KOPECKY:    Twelve times now.
24        Q     The answer is yes, you did?
25              MR. KOPECKY:    With that same objection.
0128
 1        A     Yes.
 2        Q     And the question was asked a little bit
 3   differently this time because I said regardless of who
 4   wrote it, Norstra Exhibit No. 31 you had final approval.
 5              MR. KOPECKY:    Objection, foundation, form and
 6   it mischaracterizes the testimony as the SEC is using that
 7   word.  Go ahead and answer it.
 8        A     Yes.
 9              MR. CASTANO:    We're off the record at 2:11
10   p.m.
11              (Whereupon, a recess was taken.)
12              MR. CASTANO:    We're on the record at 2:30 p.m.
13   Mr. Dany, while we were off the record were there any
14   substantive conversations between the Commission staff and
15   yourself?
16              THE WITNESS:    No, sir.
17              MR. CASTANO:    Please mark this as Norstra
18   Exhibit No. 33.
19              (Norstra Exhibit No. 33 marked
20              for identification.)
21        Q     For the record I'm showing you what's just been
22   marked as Norstra Exhibit No. 33.  Please take a moment to
23   review.
24              (Witness perusing document)
25        Q     Mr. Dany, have you seen Norstra Exhibit No. 33
0129
 1   before?
                               Page 53
```