# Exhibit 2

```
                    28271 dany.eric 021014
                                                                    1


 1   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 2

 3    In the Matter of:              )

 4    NORSTRA ENERGY, INC.           ) File No. NY-8939

 5                                   )

 6

 7    WITNESS:    Eric Dany

 8    PAGES:      1 through 144

 9    PLACE:      Securities and Exchange Commission
                  3 World Financial Center
10                New York, New York  10281

11

12    DATE:       Monday, February 10, 2014

13
                  The above-entitled matter came on for hearing,
14   pursuant to notice, at 10:19 a.m.

15

16

17

18

19

20

21

22

23

24

25


                                                                    2


 1    APPEARANCES:
```

Page 1

```
                    28271 dany.eric 021014
 2
 3   On behalf of the Securities and Exchange Commission:
 4
 5         NANCY BROWN, ESQ.
 6         CHRISTOPHER CASTANO, ESQ.
 7         YITZCHOK KLUG, ESQ.
 8         MICHAEL PAELY, ESQ.
 9         Division of Enforcement
10         Securities and Exchange Commission
11         3 World Financial Center
12         New York, New York 10281
13
14   On behalf of the Witness:
15         JAMES KOPECKY, ESQ.
16         KSB Legal
17         203 N. LaSalle, Suite 1620
18         Chicago, Illinois 60601
19
20
21
22
23
24
25
```

                                                                3

```
 1                        C O N T E N T S
 2   WITNESS:                                         EXAMINATION
 3   Eric Dany                                                10
```

```
                        28271 dany.eric 021014
 7      A    Yes, sir.
 8      Q    I want to direct your attention to the statement
 9   "EDSP does not perform any due diligence on the stocks and
10   companies discussed herein."
11      A    Yes, sir.
12      Q    What did you mean by that?
13      A    Due diligence in my understanding of it or as I
14   apply it means that you go below the surface of company
15   statements to examine specific facts, documents, financials,
16   information that is far more detailed and in-depth than
17   looking at the publicly available information.
18      Q    Does it mean anything else to you?
19      A    I'm sure it does, but sitting here today I can't
20   expound upon that.
21      Q    I want to direct your attention to the sentence
22   begins a few sentences down, "Although the information
23   contained in this advertisement is believed to be reliable."
24   Take a moment to find it.
25           (Pause.)
```

                                                                43

```
 1      A    Yes, sir.
 2      Q    Do you know what that sentence is referring to,
 3   "Although the information contained in this advertisement is
 4   believed to be reliable"?
 5      A    It's pretty clear to me.
 6      Q    What does it mean to you?
 7      A    It means that the information contained in this
 8   advertising is believed to be reliable.
 9      Q    Did you ever have any conversations with anyone
```

28271 dany.eric 021014

10  that called that into question, meaning the information in
11  the advertisement, this e-mailer or an e-mailer that you
12  produced, wasn't reliable?
13      A   I'm not sure I understand the distinction, sir.
14      Q   Did you have any conversations with anyone
15  concerning whether the information contained in any e-mailer
16  that you reviewed or looked at wasn't reliable?
17      A   I can't think of any.
18      Q   Did you have any conversations with anyone
19  concerning whether the megalog, the actual what we talked
20  about last time, the mailer that went out, wasn't reliable or
21  the information contained in it wasn't reliable?
22      A   No, I don't think there was any questions about the
23  information being reliable.
24      Q   Do you recall having any conversations with anyone
25  about having concerns about whether the information in the e-

44

1   mailer was reliable?
2       A   I had a question of Mr. Wence, but I don't think it
3   concerned reliability of information.
4       Q   What was that question, that you had for Mr. Wence?
5       A   I received an e-mail from a copywriter by the name
6   of Daniel Breckenridge.
7       Q   Can you spell that for the record?
8       A   D A N I E L, B R E C K E N B R I D G E. He is a
9   copywriter. He sent me an e-mail, and I don't' remember the
10  exact content of it, as I told you last time, and what I did
11  was I cut and pasted some of the information that Mr.

28271 dany.eric 021014

12   Breckenridge sent me into an e-mail. I didn't understand
13   what he was talking about, and I think he asked did you mean
14   to say this or something to that effect, and I read through
15   it, and I didn't understand what his concern was. I sent it
16   on to Mr. Wence, and somebody was concerned. Then I sent it
17   on to Mr. Wence to get his opinion, and as I told you, I
18   never heard back from Mr. Wence. I did hear back from Mr.
19   Wence. He told me he had sent it to Mr. Kaitz. I never
20   received any response from that.
21       Q   Do you have that e-mail?
22       A   No, I do not.
23       Q   You do not have it anymore?
24       A   No.
25           MS. BROWN:   When did you get it?

45

1            THE WITNESS:   I think it was  - I don't know if it
2    was during the e-mail campaign or during the direct mail
3    campaign.
4        Q   And do you have Mr. Breckenridge's contact
5    information?
6        A   I believe I do.
7        Q   Do you have his phone number?
8        A   I believe I do.
9        Q   Do you have his e-mail?
10       A   Yes, sir.
11       Q   How do you know him?
12       A   He's a copywriter. I have worked with him on
13   occasion on other investor relation campaigns.
14       Q   How often do you communicate with him?

Page 41

28271 dany.eric 021014

15    A    Seldom.

16    Q    When you say seldom, is it once a year?

17    A    I probably haven't heard from Mr. Breckenridge -
18  probably once a year over the last couple of years.

19    Q    When was the last time you worked with him as a
20  copywriter?

21    A    Several years ago. I couldn't tell you.

22    Q    Was it before 9-11 or after 9-11?

23    A    After 9-11, sir.

24    Q    Do you recall whether it was before, and we'll just
25  use the date 2006?

46

1    A    Please repeat that.

2    Q    Was it before 2006, the last time you worked with
3  him?

4    A    Sitting here today, I cannot tell you, sir.

5    Q    In the last four years, let's say, how often have
6  you communicated with him?

7    A    I don't know if I, in the last four years, have
8  done a project with Mr. Breckenridge. In the event I did,
9  there would be several e-mails. In the last year, I probably
10  heard from him once.

11    Q    Do you know if you did a project with him in 2013?

12    A    Yes, I do. I did not.

13    Q    Do you recall whether you did a project with him in
14  2012?

15    A    I don't believe so.

16    Q    How about 2011?

                          28271 dany.eric 021014
 3    prior to April 30, 2013?
 4        A    Probably back in March.  If I may reference this.
 5    That's a statement of my belief.
 6        Q    What?
 7        A    This is my opinion.
 8        Q    Wait.  What, Mr. Dany?
 9        A    Norstra Energy's acreage could hold as much as 8.5
10    billion barrels.
11             BY MR. CASTANO:
12        Q    Just to be fair, what you appear to be reading
13    from, you said Norstra Energy's 10,097 acres, and we
14    understand that your opinion is that Norstra Energy in its
15    entirety, essentially what it could acquire, could hold that.
16    We were asking a specific question, and we've already gotten
17    the answer we need, so we don't need to ask any  -
18             MR. KOPECKY:  Right, because it goes up to 500
19    billion barrels of oil in the same document that you showed
20    him that you refused to read from the right piece of paper,
21    and if you do the same math, you'll come out with that for
22    these levels of acres.
23             MR. CASTANO:  And we asked Mr. Dany, and we have
24    testimony whether he's actually seen the Wood Mackenzie
25    document whether it says that.


                                                              117


 1             MR. KOPECKY:  No.  These same reports.  You
 2    started out with 100 billion.  Then it changes to 200
 3    billion.  Then it says it can go to 500 billion.
 4             MR. CASTANO:  I have the answer I  -
 5             MR. KOPECKY:  Good, but do you want to=he right
                           Page 107

28271 dany.eric 021014

6   answer, or do you want the answer that you want?
7           MR. CASTANO:   The record speaks for itself.
8           MR. KOPECKY:   It's junk because of the way the
9   questions are being asked.
10          MR. CASTANO:   That's inappropriate.
11          MR. KOPECKY:   It's inappropriate to put this man
12  through this for the second day in a row in New York.  Do you
13  know how hard it is for him to get here, and then you don't
14  even  - let's get this going.
15          MR. CASTANO:   Okay.
16          (Pause.)
17          BY MR. CASTANO:
18    Q    Mr. Dany, I'm showing you what has been previously
19  marked as Exhibit 45.  Please take a moment to  review.
20          (Pause.)
21    A    Yes, sir.  I'm familiar with this.  We've discussed
22  it before.
23    Q    What is Norstra Exhibit 45?
24    A    This is an e-mail from William Kaitz to Todd Wence.
25    Q    I want to direct your attention to the e-mail Eric

                                                                118

1   Dany to Todd Wence dated April 18, 2013 at 12:24 p.m. on the
2   bottom of the page. What is that?
3     A    This is a note that I sent, we discussed before,
4   that I sent to Mr. Wence regarding the note that I got from
5   Daniel Breckenridge that I cut and pasted his comments into
6   this and sent it on.  I sent it on to Mr. Wence who sent it
7   on to Mr. Kaitz.  It looks like Mr. Kaitz sent this to Mr.

28271 dany.eric 021014

8  Wence.  I never received anything from either of them
9  regarding this.
10      Q    I want to direct your attention to the first cut
11 and paste.  Who is this before?  You testified an  -
12      A    His name is Daniel Breckenridge.  He's a
13 copywriter.
14      Q    Did you indicate in your e-mail to Mr. Wence that
15 this was from another copywriter?
16      A    No, sir, I did not.
17      Q    Why didn't you do that?
18      A    I had no reason to.
19      Q    And I direct your attention to the first sentence,
20 "The company's leases appear to lie outside the other Bakken
21 Fairway's southern border, yet the report states that it's
22 smack in the middle of the Bakken's newly recognized sweet
23 spot."  Did you receive an answer back for that question?
24      A    No, sir.
25      Q    Did you take any investigative steps to determine

                                                         119

1  whether Norstra's leases were outside the Alberta Bakken
2  Fairway?
3       A    Let me answer that question by stating this.  The
4  short answer is no.  The long answer is I don't believe that
5  this copywriter had all the information in front of him that
6  we had, and as a result, some of his information is  - he
7  made these statements without all the information that I had.
8       Q    I want to direct your attention to the second item.
9  "The company holds slightly less than 16 sections of the
10 2,850 section Fairway.  The report states that each section