# Exhibit 6

# In The Matter Of:

*Securities and Exchange Commission v.*
*Norstra Energy Inc., et al.*

*William Thomas Johnson Kaitz*
*April 6, 2016*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 29147Kaitz.txt
**Min-U-Script® with Word Index**

Case 1:15-cv-04751-WHP   Document 74-7   Filed 07/20/16   Page 3 of 8

Securities and Exchange Commission v.
Norstra Energy Inc., et al.

William Thomas Johnson Kaitz
April 6, 2016

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF NEW YORK
 3  - - - - - - - - - - - - - - -
 4  SECURITIES AND EXCHANGE      )
 5  COMMISSION,                  )
 6           Plaintiff,          )  CASE NO.
 7  vs.                          )  15 Civ. 4751 (WHP)
 8  NORSTRA ENERGY INC., GLEN    )
 9  LANDRY and ERIC DANY,        )
10           Defendants.         )
11  - - - - - - - - - - - - - - -
12
13
14        DEPOSITION OF WILLIAM THOMAS JOHNSON KAITZ
15               WEDNESDAY, APRIL 6, 2016
16
17
18
19
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                        BY:   STEVEN POULAKOS, RPR
23                        160 SPEAR STREET, SUITE 300
24                      SAN FRANCISCO, CALIFORNIA 94015
25                                     (415) 597-5600
```

Page 2

```
 8       Deposition of WILLIAM THOMAS JOHNSON KAITZ, taken
 9  on behalf of PLAINTIFF at the U.S. Securities and
10  Exchange Commission, 100 F Street, N.E., Washington,
11  D.C., commencing at 9:00 a.m., WEDNESDAY, APRIL 6, 2016,
12  before Steven Poulakos, Certified Shorthand Reporter,
13  Notary Public pursuant to the Notice of Deposition.
```

Page 3

```
 1  APPEARANCES OF COUNSEL:
 2  FOR THE PLAINTIFF:
 3     U.S. SECURITIES AND EXCHANGE COMMISSION:
 4     DIVISION OF ENFORCEMENT
 5     BY:  JORGE G. TENREIRO, ESQUIRE
 6          NANCY BROWN, ESQUIRE
 7     200 Vesey Street
 8     Suite 400
 9     New York, New York 10281
10     Telephone:  (212) 336-9145
11     Email:  tenreiroj@sec.gov
12
13  FOR THE DEFENDANT, GLEN LANDRY:
14     TOLLEFSEN LAW, PLLC
15     BY:  FARA DAUN, ESQUIRE - (VIA TELEPHONE)
16     2122 164th Street, S.W.
17     Suite 300
18     Lynwood, Washington 98087
19     Telephone:  (206) 219-6627
20     Email:  fara@tollefsenlaw.com
```

Page 4

```
 1  APPEARANCES OF COUNSEL - (CONTINUED):
 2  FOR THE WITNESS, WILLIAM THOMAS JOHNSON KAITZ:
 3     GREENBERG TRAURIG, LLP
 4     BY:  MIRIAM G. BAHCALL, ESQUIRE
 5     77 West Wacker Drive
 6     Suite 3100
 7     Chicago, Illinois 60601
 8     Telephone:  (312) 456-8400
 9     Email:  bahcallm@gtlaw.com
10
11  FOR THE DEFENDANT, ERIC DANY:
12     KOPECKY, SCHUMACHER, BLEAKLEY & ROSENBURG, P.C.
13     BY:  JAMES L. KOPECKY, ESQUIRE
14     203 N. LaSalle Street
15     Suite 1620
16     Chicago, Illinois 60601
17     Telephone:  (312) 380-6552
18     Email:  jkopecky@ksblegal.com
```

Case 1:15-cv-04751-WHP   Document 74-7   Filed 07/20/16   Page 4 of 8

| Securities and Exchange Commission v.<br>Norstra Energy Inc., et al. | William Thomas Johnson Kaitz<br>April 6, 2016 |
|---|---|

## Page 37

1  Q  And you mean for e-mail -- for brokering
2  e-mail lists?
3  A  Either brokering lists or being hired -- a
4  list being hired.  There were volumes of wires that
5  were sent out for that campaign to numerous recipients.
6  Q  Other than people who -- whose lists were
7  being hired, other job categories that we haven't
8  covered?
9  A  Job categories?
10 Q  Yes.
11 A  Not that I can recall.
12 Q  And did you enter into any written
13 agreements with any of these individuals governing your
14 involvement with the Norstra project?
15 A  Yes.
16 Q  What agreements?
17 A  I do recall signing an agreement with
18 Arista Theme.  I also recall an agreement with Eric
19 Dany, and there may be an agreement or two, maybe more,
20 that were signed with individual e-mail lists as well.
21 Q  Anything else?
22 A  Could you repeat the original question?
23 Are you asking that I signed or that --
24 Q  Yes, that you entered into, that -- or Full
25 Service Media entered into with respect to the Norstra

## Page 38

1  project?
2  A  Not that I recall at the time.
3  Q  You mentioned an agreement with Mr. Dany?
4  A  That's correct.
5     MR. TENREIRO:  And let's mark this as 2,
6  please.
7     (Kaitz Exhibit 2 marked for purposes of
8  identification.)
9  BY MR. TENREIRO:
10 Q  So I've handed you what I asked the court
11 reporter to mark as Kaitz Exhibit 2.  Please take a
12 look at it.
13 A  (Witness reviewing document.)
14 Q  Have you seen this document before?
15 A  I have.
16 Q  And what is this?
17 A  This is an investor relations project
18 agreement that Eric Dany has his clients sign, that I
19 signed.
20 Q  And is this the agreement that governed you
21 and Mr. Dany's relationship with respect to the Norstra
22 project?
23 A  As I understood it, yes.
24 Q  And do you typically sign these types of
25 agreements with endorsers in the projects you work on?

## Page 39

1  A  I'd say that's fair.
2  Q  Can you turn to the second page, please.
3     Is that your signature there?
4  A  Yes.
5  Q  Okay.  And the date April 1st, 2013, is
6  that consistent with your recollection as to the timing
7  of the Norstra campaign?
8  A  Yes.
9  Q  And Mr. Dany appears not to have signed
10 this version of the agreement.
11    Do you know why?
12 A  Yes.  As this was for his purposes, I don't
13 recall ever asking for a countersignature.
14 Q  So you're testimony is he asked you to sign
15 this agreement?
16 A  That is correct.
17 Q  If you go back to the first page, it refers
18 to Full Service Media, LLC, as "client," in
19 parenthesis.
20    Do you see that at the top?
21 A  I do.
22 Q  So what does that mean?  What does that
23 mean with respect to the relationship between Full
24 Service Media and Mr. Dany?
25    MS. BAHCALL: Objection, foundation.  He

## Page 40

1  didn't draft this agreement.
2  BY MR. TENREIRO:
3  Q  What is your understanding of what this
4  means?
5  A  I managed the relationship between my
6  client and Eric Dany -- or on behalf of my client, and
7  the money, technically, was sent from my company's bank
8  account.  So historically, the majority of people that
9  I work with prefer their agreements be with the
10 source -- their immediate source of -- or the, you
11 know, the bank source of funds.
12 Q  And did you understand yourself to be
13 Mr. Dany's client?
14 A  I technically refer to myself as an
15 "agent."
16 Q  Do you see number 2 in the agreement?  It
17 says Project, and then the last sentence reads:  The
18 campaign is an effort to increase industry and investor
19 awareness for NORX.
20    Do you know if NORX stands for Norstra, the
21 stock symbol for Norstra?
22 A  That's what I understand that ticker symbol
23 to be for, correct.
24 Q  And do you agree with the statement that
25 the campaign is an effort to increase industry and

Case 1:15-cv-04751-WHP   Document 74-7   Filed 07/20/16   Page 5 of 8

| Securities and Exchange Commission v.<br>Norstra Energy Inc., et al. | William Thomas Johnson Kaitz<br>April 6, 2016 |
|---|---|

Page 61

1  Q   What do you mean by that?
2  A   I, personally, don't typically send out
3  e-mails that are this long as it affects deliverability
4  into an inbox. So, again, without taking a lot of time
5  and investigation, I can't tell you 100 percent that
6  this was a landing page, although it appears to be a
7  copy of a landing page.
8  Q   Okay. I think these -- sixth page of the
9  document, the one that ends in SECLIT-000096466.
10     Can you turn to that, please.
11 A   Okay.
12 Q   Do you see in the middle, it says: Norstra
13 Energy's 10,097 acres could hold as much as
14 8.5 billion barrels of original oil in place.
15     Do you see that?
16 A   I do.
17 Q   Do you know the source of that information?
18 A   I don't.
19 Q   Do you know if information like this
20 appeared in any other versions of the e-mail that might
21 have gone out to investors in the Norstra campaign?
22 A   I believe it did.
23 Q   And what about in the magalog? Do you know
24 if that information was contained in the magalog?
25 A   I believe it was.

Page 62

1  Q   So turning back to the magalog for a
2  second, whose idea was it to create a magalog? Or why
3  was a magalog created?
4  A   Historically, the client desired to do a
5  magalog or send hard mail or direct mail.
6  Historically, direct mail pieces are a strong way of
7  raising awareness for companies.
8  Q   Okay. And in the Norstra case, was it your
9  client that requested a hard-mail piece?
10 A   I believe so.
11 Q   And what is the different -- what
12 differences do you recall between the e-mail or the
13 landing page and the hard copy in the Norstra campaign?
14     MS. BAHCALL: Objection, vague, overbroad.
15     Are you asking about content --
16     MR. TENREIRO: Content.
17     MS. BAHCALL: -- and the way it looked?
18     If you remember.
19     THE WITNESS: I don't remember.
20 BY MR. TENREIRO:
21 Q   Is there anything different between -- was
22 there anything different in the Norstra campaign
23 between the e-mail landing page and the direct mail in
24 terms of the strategy of the campaign?
25 A   I don't kn.

Page 63

1  Q   I think you mentioned in terms of when it
2  comes to the e-mails, there's some sort of
3  considerations about spam filters and things like that?
4  A   Yes.
5  Q   Do those consideration
6  apply in the context of direct mailing -- direct, you
7  know, direct mail pieces?
8  A   No. The concepts are different.
9  Q   So how are they different?
10 A   In e-mail, words, and symbols are triggers
11 for certain service providers. Percentage signs and
12 words such as "billions" or "profit" will prohibit some
13 e-mails from getting to an inbox versus a spam filter.
14 In a print medium, you don't have those sort of
15 limitations. Mailboxes will accept any verbiage you
16 use.
17 Q   And do you recall whether your client
18 reviewed the magalog before it was sent out to
19 investors in the Norstra campaign?
20 A   I believe so.
21 Q   And did they provide any comments?
22 A   I don't remember.
23 Q   Do you remember anything they might have
24 said at all with respect to the magalog?
25 A   I don't recall.

Page 64

1      MR. TENREIRO: Let's go to Weintz Exhibit
2  21, previously marked.
3      (Exhibit 21 was previously marked for
4  purposes of identification.)
5      THE WITNESS: (Witness reviewing document.)
6      MR. KOPECKY: You know what. Maybe before
7  we get into this, it would be a good time for a break.
8      (There was a brief recess taken.)
9      (Deposition recessed at 10:48 a.m.)
10     (Deposition resumed at 10:57 a.m.)
11 BY MR. TENREIRO:
12 Q   Mr. Kaitz, I think before we went off, I
13 handed you what's been previously marked as Weintz
14 Exhibit 21.
15     Do you recognize this document?
16 A   I do.
17 Q   And what is it?
18 A   It appears to be a later version of the
19 direct mail magalog for creative.
20 Q   For the Norstra campaign?
21 A   That is correct.
22 Q   In terms of the direct mail or magalog for
23 the Norstra campaign, was there one version or more
24 than one versions?
25 A   We sent out two. We did two separate

Case 1:15-cv-04751-WHP   Document 74-7   Filed 07/20/16   Page 6 of 8

Securities and Exchange Commission v.
Norstra Energy Inc., et al.
William Thomas Johnson Kaitz
April 6, 2016

Page 65

1 printing, although with the exception of dates and
2 budget managed by Full Service Media, to my knowledge,
3 there weren't many changes.
4   Q   So two versions is what you recall,
5 basically?
6   A   Two rounds of print.
7   Q   Two rounds of print. Okay.
8       Before the first round of print, did you
9 send a draft of it to Mr. Dany for his review?
10  A   I don't recall who sent it, but he did
11 receive a copy.
12  Q   Okay. And did Mr. Dany approve it for
13 dissemination, before it was disseminated?
14  A   Yes.
15  Q   Did you review the contents of the magalog
16 for factual accuracy before it was sent out to
17 investors?
18  A   No.
19  Q   Do you know if Mr. Dany did?
20  A   I believe he did.
21  Q   What's the basis for that belief?
22  A   I was CC'd on numerous e-mails between him
23 and Todd Weintz, in some cases asking for
24 clarification, and other offering phone calls to
25 discuss clarification of figures used in the

Page 66

1 development of creative.
2   Q   In connection with the Norstra project, did
3 you have conversations with Mr. Weintz about what would
4 be in the pieces themselves, what information would be
5 in the pieces themselves?
6   A   I don't recall.
7       MR. TENREIRO: Let's go to what's been
8 previously marked as Weintz Exhibit 2, please.
9       (Exhibit 2 was previously marked for
10 purposes of identification.)
11 BY MR. TENREIRO:
12  Q   This is previously marked.
13  A   (Witness reviewing document.)
14  Q   Actually, before we talk about this
15 document, sir, and I apologize if I asked you before,
16 when did you receive a call from Arista Theme with
17 respect to the Norstra campaign?
18  A   As I recall, sometime in March.
19  Q   Of 2013?
20  A   That is correct.
21  Q   Okay. So now referring to Exhibit --
22 Weintz Exhibit 2, do you recognize this e-mail
23 exchange?
24  A   I do.
25  Q   And what is it, generally?

Page 67

1   A   Generally, it was just the beginnings of
2 engaging or continuing the engagement of Todd Weintz as
3 the copywriter for Norstra.
4   Q   Can I ask you to please turn to the second
5 page, which has SECLIT-9475. In the middle of it,
6 there appears to be an e-mail from yourself sent on
7 March 14, 2013, to Mr. Weintz.
8       Do you see that?
9   A   I do.
10  Q   Is that consistent with your recollection
11 as to the timing of when you got involved with the
12 Norstra campaign?
13  A   It is.
14  Q   The second paragraph of the e-mail reads:
15 Moving on. I have some money ready for you. Will have
16 to run through Finn, and it's 15K for NORX. I need to
17 know what you have received on that to date, what have
18 you done and when you can be done.
19      What is that? What was going on there?
20 What are you saying there?
21  A   At this stage, all I knew from Arista Theme
22 was that Todd Weintz had been involved to some
23 capacity, but they didn't know what. So prior to --
24 prior to engaging Finn, I wanted to know at what stage
25 in the process he was and whether he had anything so

Page 68

1 that I could ensure he had he everything he needed or
2 take a look at what he had.
3   Q   So in other words, here you're kind of
4 catching up to what's already happened?
5   A   That's fair to say.
6   Q   Okay. And then do you see a response from
7 Mr. Weintz above that, appears to be also March 14th,
8 2013, the second paragraph -- or the second full
9 sentence he says: Great. Ready to go. Have received
10 nothing on NORX, but had an enlightening 20-minute chat
11 with Glen Landry, the geologists.
12      Do you see that?
13  A   I do.
14  Q   Are you familiar with someone named Glen
15 Landry?
16  A   Do you mean at the time this e-mail was
17 sent?
18  Q   Yes, at the time, had you heard of someone?
19  A   I don't believe I did.
20  Q   What about Glen Landry?
21  A   At the time, I'm not entirely sure.
22  Q   And today you have an understanding as to
23 who Mr. Landry is?
24  A   Today I do.
25  Q   And who is that?

Case 1:15-cv-04751-WHP   Document 74-7   Filed 07/20/16   Page 7 of 8

| Securities and Exchange Commission v.<br>Norstra Energy Inc., et al. | William Thomas Johnson Kaitz<br>April 6, 2016 |
|---|---|

Page 153

1  Q    And at the bottom of that paragraph, you
2  say: Can say the same thing overall, but for e-mail
3  deliverability, I need to edit the verbiage at least
4  30 percent (trust me, it makes a difference, image
5  placement will also help).
6         Can you explain that a little bit for a
7  layman?
8  A    Sure.
9         There are some varying levels of what we
10 call Internet service providers, or ISPs.  They all
11 have varying levels of filters for spam.  What they do,
12 since -- like a company or an ISP like Gmail or Yahoo!
13 hosts millions of e-mails, if you sent it to a portion
14 of their database on Monday and then again -- another
15 portion on Tuesday, they know that you've been sending
16 the same e-mail to the same people.
17        So you have to -- so on Monday, you have to
18 send a different e-mail than Tuesday, or despite the
19 fact that you don't use spamy words, as we call them,
20 like "billions" or whatever, you'll still get filtered
21 in the spam on Tuesday, because they're like, we just
22 saw this e-mail sent to a hundred thousand people
23 yesterday; today it sent another 50.  This is probably
24 an offer.  Let's throw into spam.
25        So by doing this, what we then do is we

Page 154

1  start rotating it out.  And this is where I said it's
2  very complicated, difficult, and cumbersome to change
3  things in the middle of a campaign.  So we send out
4  e-mail A on Monday, e-mail B on Tuesday, and I track it
5  in an Excel spreadsheet, which I believe was given
6  previously.
7  Q    And when you say, can say the same thing
8  overall, what do you mean there?
9  A    I don't want him to change the content of
10 the e-mail.  I want him to say the exact same thing in
11 a different way.  So tomato, tomato (pronouncing).
12 Q    And, I need to edit the verbiage at least
13 30 percent.
14        Is that for the purposes that you were just
15 describing, of not allowing the ISPs to realize it's
16 the same?
17 A    That's exactly right.
18 Q    And so in the case of Norstra, I guess how
19 many times was an e-mail sent out to different lists?
20 A    I would struggle to give you an answer, but
21 it was numerous.
22 Q    More than ten, say?
23 A    To one specific list?
24 Q    No, no.  To any list.
25 A    Oh.  Yes, way more than ten.

Page 155

1  Q    And in other campaigns that you've done up
2  to that point, was that typically the case?  So in
3  other words, I'm trying to understand do you send out
4  the e-mail one time to one list?  In Norstra, you just
5  said you did; but in other campaigns, did you ever have
6  a campaign where you sent it one time?
7  A    Only if it was the -- only if the length of
8  the campaign didn't last more than two weeks.  That
9  would have happened where I sent the endorsed approved
10 creative to one list one time, but there's only a
11 finite number of available lists to rent in the
12 financial space.  So it is likely, if a campaign ran
13 longer than 26 days, that you would start -- you would
14 be hitting the same lists over and over again.
15 Q    When you hit the same list over and over
16 again in your prior campaigns, was it typical to make
17 deliverability-type edits or analytics-type edits to
18 the e-mails?
19 A    Yes.
20 Q    Up to this point, before Norstra, had you
21 ever worked with Mr. Dany on a campaign that just went
22 one time to one e-mail serve -- or one e-mail list?
23 A    That I managed, I don't believe so.  So I
24 don't believe so.
25 Q    By the way, do you get copies of the

Page 156

1  e-mails that get sent out every time, that there's a
2  distribution?  Do you, yourself?
3  A    I'd say more often than not, I'm given the
4  test e-mail that we reviewed earlier, and then I have a
5  separate e-mail that I track.  Not every e-mail that
6  was sent goes into my tracking e-mail address, but I --
7  more often than not, I may have missed one or two, but
8  it's more likely that I received one that didn't.
9  Q    What's that e-mail address?
10 A    That's stockleads81@gmail.com.
11 Q    That belongs to you?
12 A    Correct.
13 Q    Or Full Service Media?
14 A    Full Service Media.
15 Q    Okay.  And do you know whether other
16 individuals involved in the Norstra campaign also
17 received the e-mails as they were being sent out?
18 A    I'm aware that -- I'm aware that Mr. Dany
19 received a few of the e-mails, but I don't know if
20 there's any guarantee that he received them all.
21 Q    How were you aware that he received a few
22 of the e-mails?
23 A    Because he had referenced the e-mail this
24 morning in other communications, which would indicate
25 that he had seen an e-mail that went out.

Case 1:15-cv-04751-WHP   Document 74-7   Filed 07/20/16   Page 8 of 8

Securities and Exchange Commission v.
Norstra Energy Inc., et al.

William Thomas Johnson Kaitz
April 6, 2016

Page 269

1   Also find Kaitz 9.
2   Q   And then 9?
3   A   Kaitz 9.
4       Not that I can tell.
5   Q   Okay. So let's start with Weintz 21?
6   A   Okay.
7   Q   What's the basis for your belief that
8   Weintz 21 was likely seen by the public?
9   A   Because this appears to be a copy that was
10  mailed to me because of the -- there is my home address
11  at the time printed on page SECLIT-000092743. At any
12  drafts stage, there would be no reason for my name in a
13  U.S. PS print barcode to have been present on a draft.
14  Q   Okay. It makes perfect sense to me.
15      Can you tell me how many members of the
16  public Exhibit 21 was mailed to, other than you?
17  A   Based on this, or from my recollection of
18  the campaign?
19  Q   Based on anything right now.
20      MS. BAHCALL: -- actually got it?
21      (Reporter clarifies.)
22      THE WITNESS: How many was mailed to was
23  the question.
24      MS. BAHCALL: No, he's asking how many got
25  it.

Page 270

1       MR. KOPECKY: No, that's where I'm -- my
2   next question is. First is, how many it was mailed to
3   him. The next is, can you tell me --
4       THE WITNESS: As of this date, anywhere
5   between one and a half and two and a half million
6   pieces of mail were sent out.
7   BY MR. KOPECKY:
8   Q   How do you know that?
9   A   If you look at page -- Bates stamp number
10  SECLIT-000092738, the first line of my -- of the
11  third-party advertiser agency disclaimer says, 3.640840
12  U.S. dollars as of June 7th, 2013, which indicates this
13  was the second round of mail. Total mail sent was
14  around one -- around two and a half million in the
15  entirety of the campaign.
16      I don't know at what point, because the
17  mail is offset by hundreds of thousands, so that's the
18  justification for the range. We know that a million,
19  minimum, had already been sent out by this point. The
20  number could range anywhere from 1.5 to 2.5 by the time
21  this piece had made it to my home address.
22  Q   So the $3.6 million, roughly, in the
23  disclaimer in Exhibit -- Weintz Exhibit 21 is just
24  payment for the written -- for the direct mail magalog
25  piece?

Page 271

1   A   No.
2   Q   Okay. So I still don't understand how you
3   used that -- so did that 3.6 million include the direct
4   mail and the e-mail?
5   A   And of June 7.
6   Q   And I understand Exhibit 21 to be a direct
7   mail magalog, correct?
8   A   That's correct.
9   Q   So how do you use the 3.6 million to figure
10  out how many were actually mailed? I'm confused.
11  A   Because I can use that number to determine
12  at what stage in the printing -- the first round that
13  was printed had a lower number. So the first round
14  would have all -- all million pieces would have had a
15  lower number. So I know by the fact this has a higher
16  number than 2 million and change, that this was the
17  second round of print, which means by the time this hit
18  my home address, we had already sent a million pieces,
19  minimum.
20  Q   Okay. And you actually had told Eric Dany
21  that you were only going to send a million pieces,
22  correct?
23      MR. TENREIRO: Objection.
24      THE WITNESS: I don't believe that's
25  correct.

Page 272

1       MR. KOPECKY: It's the only one I have.
2       Will you please mark this.
3       (Kaitz Exhibit 31 marked for purposes of
4   identification.)
5   BY MR. KOPECKY:
6   Q   It's previously been marked as Exhibit 48.
7   I don't know why, but it's now marked Exhibit 31,
8   FSM-7712.
9       Do you recognize --
10      MR. TENREIRO: Just so the record is clear,
11  Exhibit 48 is from the testimony. That's 48 in the
12  testimony.
13      MR. KOPECKY: Of Mr. Kaitz's testimony?
14      MR. TENREIRO: Just 48 of all of the
15  testimony of the SEC --
16  BY MR. KOPECKY:
17  Q   Do you recognize Exhibit 31?
18  A   Yes.
19  Q   Okay. Is it an e-mail dated May 7, 2013,
20  from yourself to Eric Dany?
21  A   Yes.
22  Q   And are you telling him, in that e-mail,
23  that the direct mail piece will be one million mailed
24  flat?
25  A   Yes.