```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
SECURITIES AND EXCHANGE              :
COMMISSION,
                                     :
        Plaintiff,
                                     :      15cv4751
        -against-
                                     :      OPINION & ORDER
NORSTRA ENERGY INC., GLEN
LANDRY, and ERIC DANY,               :

        Defendants.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

WILLIAM H. PAULEY III, District Judge:

The SEC brings this enforcement action alleging violations of Exchange Act Section 10(b) and Rule 10b–5(b) against Norstra Energy, Inc. ("Norstra"), its CEO Glen Landry, and Eric Dany, the editor of two newsletters: the "Stock Prospector" and the "Mutual Fund Prospector."

Dany moves for summary judgment, asserting that he did not "make" the alleged misstatements. The SEC also moves for partial summary judgment on two elements of the 10b–5(b) claim: that the alleged misstatements were made "in connection with" the purchase or sale of securities; and "ma[d]e" "by the use of any means or instrumentality of interstate commerce, or of the mails." Exchange Act Rule 10b–5(b), 17 C.F.R. 240.10b–5(b). Dany's motion for summary judgment is denied. The SEC's motion for partial summary judgment is granted.

BACKGROUND

In 2010, Norstra was incorporated in Nevada, purportedly to engage in the business of oil exploration, drilling, and extraction. (Eric Dany's Response to Securities and Exchange Commission's Local Rule 56.1 Statement ("Dany 56.1 Opp."), ECF No. 73, ¶ 1.)

Norstra traded on "OTC Link," an over-the-counter exchange.  (Dany 56.1 Opp. ¶ 1.)

In 2013, a British Virgin Islands–based company called Arista Theme Ltd. contacted Full Service Media ("FSM") and its owner William Kaitz, seeking to fund a campaign to promote Norstra's stock.  (E.g., Plaintiff's Responses to Defendant Eric Dany's Local Rule 56.1 Statement of Facts ("SEC 56.1 Opp."), ECF No. 70, ¶¶ 2–4.)  Arista budgeted $4.1 million for the campaign, and agreed to pay Kaitz $700,000.  (SEC 56.1 Opp. ¶¶ 2–5.)  Kaitz's role was to hire staff for the campaign, serve as an e-mail address list broker, and ensure that the promotions were delivered to potential investors.  (SEC 56.1 Opp. ¶ 5.)  Kaitz hired Todd Weintz as a copywriter to prepare the promotions, including a "marketing piece" and a "landing page" on the Internet site to which readers would be directed.  (SEC 56.1 Opp. ¶¶ 8–11.)

Kaitz retained Dany to act as the campaign's "endorser."  (SEC 56.1 Opp. ¶ 30.)  Dany's role was to lend the promotional campaign his "Stock Prospector" brand identity and image.[1]  (SEC 56.1 Opp. ¶ 30.)  Under his agreements with FSM, Dany would not use his own website or newsletter to promote Norstra's stock.  Rather, he would serve as the "spokesperson" for a separate e-mail and direct-mail promotional campaign created in conjunction with Weintz and Kaitz.  (June 17, 2016 Declaration of Jorge G. Tenreiro ("Tenreiro Decl. 1"), ECF No. 62, Ex. 6; Tenreiro Decl. 1, Ex. 7; SEC 56.1 Opp. ¶¶ 41–43.)  FSM paid Dany a total of $20,000 for the print and e-mail campaign and $5,111.95 for renting the addresses of certain of his subscribers.  (SEC 56.1 Opp. ¶¶ 33–34.)

Weintz created the first draft of the promotional materials.  (SEC 56.1 Opp.

---

[1] In the promotional materials, the "Stock Prospector" and "Mutual Fund Prospector" brand are recognizable by their logo: a horseback-riding prospector with a wide-brimmed hat, trailed by another horse, presumably searching for microcap stocks.

¶¶ 21–24.)  Thereafter, Kaitz provided "concept" copies of these initial drafts to Arista to secure approval for their strategic approach.  (SEC 56.1 Opp. ¶ 26; July 11, 2016 Declaration of Jorge G. Tenreiro ("Tenreiro Decl. 2"), ECF No. 69, Ex. 8, February 23, 2016 Todd Weintz Deposition ("Weintz Dep."), at 45:20–46:19; Tenreiro Decl. 2, Ex. 1, April 6, 2016 William Kaitz Deposition, at 77:6–78:12.)  Dany also reviewed the drafts, suggesting edits and corrections.  (SEC 56.1 Opp. ¶¶ 11–28.)  Once Kaitz and Weintz obtained Dany's approval, Kaitz arranged for the campaign material to be disseminated through hardcopy and e-mail lists, including certain subscribers to Dany's newsletters.  (SEC 56.1 Opp. ¶¶ 43, 50–51.)

The completed promotional materials begin with the header, "Eric Dany's Stock Prospector" and a headshot of Eric Dany.  (Def. Ex. N, ECF No. 67-10; Tenreiro Decl. 2, Exs. 21, 25, 31, 32.)  The promotional letters were styled as conversations between Dany and potential investors in Norstra stock:

> My name is Eric Dany.  I'm editor and publisher of ***Eric Dany's Stock Prospector, Main Street Research*** . . . Now I'm predicting that **NORX** could be my best ever call!  I believe the company's estimated 8.5 billion barrels of oil in place could easily fetch $25 a share in a takeover!  Act now, before a takeover move, and you could make a fortune! . . . Don't wait!  As you'll see when you read on, I believe one of the majors may be reading a takeover offer that, the minute it leaks out, could send this stock flying!

(E.g., Tenreiro Decl. 2, Ex. 32, at 5–6.)  At the end of each piece, a disclaimer informed readers, in miniscule font, that the materials were "paid advertisement[s]."  (E.g., Tenreiro Decl. 2, Ex. 32, at 6.)  The disclaimer explained that FSM and Dany were compensated, professed that Dany performed no due diligence on Norstra, advised readers to "independently verify" any and all details, and opined that the predictions in the promotion would be protected forward-looking statements under the securities laws.  (E.g., Tenreiro Decl. 2, Ex. 32, at 7–8.)

The promotions exhorted investors with an opportunity to "cash in" on profits from the Bakken Shale Formation, trumpeting short-term investment gains between 473% and 5,557%.  (Tenreiro Decl. 2, Ex. 31, at 2.)  They urged investors to "**[t]urn $5,000 into $60,000,000 as Norstra drills wells on its <u>overlooked</u> and "<u><i>underpriced</i></u>" Bakken Resource!**" and stated that "[s]eismic data indicate[d] Norstra Energy could be sitting on top of as much as . . . **8.5 billion barrels of oil!**"  (Tenreiro Decl. 2, Ex. 31.) (underlining, bold, and italics in original, gigantic font size omitted).  The promotions emphasized that a recent Norstra project had a "99.6% probability of drilling success," and that Norstra could "duplicate the explosive 5,557% profits of Kodiak Oil & Gas!"  (Tenreiro Decl. 2, Ex. 31, at 3, 5.)  The materials advised investors that they could obtain a "**gain of 5,000%!**" meaning that a $10,000 investment "would explode in value to a cool half a million dollars!"  (Tenreiro Decl. 2, Ex. 31, at 6.)  In sum, the promotional material amped investors to "[b]uy shares of Norstra Energy (NORX) now" and "**act now before the new government [oil] estimates create another stampede!**"  (Tenreiro Decl. 2, Ex. 33, at 2, 4.)  The SEC asserts these statements were misleading.

On June 26, 2013, the SEC suspended trading in Norstra because of "[q]uestions . . . concerning the adequacy and accuracy of press releases and other public statements concerning Norstra's business operations."  See Order of Suspension of Trading, In the Matter of Norstra Energy Inc., File No. 500-1, https://www.sec.gov/litigation/suspensions/2013/34-69859.pdf; Dany 56.1 Opp. ¶ 1.  Two years later, the SEC filed this action, alleging that Norstra, Landry, and Dany made material misstatements regarding Norstra.

LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Davis v. Blige, 505 F.3d 90, 97 (2d Cir. 2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has made the initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted); see Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586–87). In deciding a summary judgment motion, a court resolves all factual ambiguities and draws all factual inferences in favor of the non-moving party. Liberty Lobby, 477 U.S. at 255; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).

DISCUSSION

The SEC alleges that Dany violated Exchange Act Section 10(b) and its implementing rule, 10b–5. Rule 10b–5(b) makes it unlawful "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any

5

national securities exchange, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

I.    "Maker" of the Statement

Dany argues that he cannot be the "maker" of the alleged misstatements under Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135 (2011). In Janus, private plaintiffs brought a Rule 10b–5 action against a family of mutual funds, arguing that Janus Capital Management LLC ("JCM") made false and misleading statements in the prospectuses of the Janus Investment Fund (the "Fund"). Janus, 564 U.S. at 140. The Supreme Court held that JCM could not be liable, as it was the Fund that had "control" over the statements that appeared in the prospectuses. Janus, 564 U.S. at 147–48. The Court relied heavily on the plain meaning of the term "make": "One 'makes' a statement by stating it. . . . The phrase at issue in Rule 10b–5, '[t]o make any . . . statement,' is thus the approximate equivalent of 'to state.'" Janus, 564 U.S. at 142. Janus distinguished the person[2] who "creates" a misstatement from the person who "makes" it, analogizing to the distinction between the person who writes and the person who delivers a speech:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who

---

[2] Courts in this District have held that it is possible for more than one person to "make" a misleading statement for purposes of Rule 10b–5 when such "ultimate authority" is shared. See, e.g., Virtus Investment Partners, Inc. Secs. Litig., --- F. Supp. 3d ----, 2016 WL 3647959, at *7 (S.D.N.Y. July 1, 2016) (citing City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012)); In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 163 (S.D.N.Y. 2012); City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011).

>   prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.  This rule might best be exemplified by the relationship between a speechwriter and a speaker.  Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

Janus, 564 U.S. at 142–43.

Whether a defendant is the "maker" of the misstatement may depend on inferential or circumstantial evidence.  "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  Janus, 564 U.S. at 142–43; see In re Puda Coal Secs. Inc. Litig., 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014); In re Stillwater Capital Partners Inc. Litig., 858 F. Supp. 2d 277, 287–88 (S.D.N.Y. 2012).  A defendant may also present evidence that a misstatement has been "falsely attributed" to him.  See Janus, 564 U.S. at 147–48.

Here, the SEC has submitted evidence that Dany "made" the alleged misstatements because they are repeatedly attributed to him.  The promotions open with a headshot of Dany; they are entitled "Eric Dany's Stock Prospector;" and they are written as if Dany is speaking to the reader, including such phrases as: "My name is Eric Dany"; "I'm the editor and publisher"; "I believe [Norstra's] estimated 8.5 billion barrels of oil . . . could easily fetch $25 a share"; "I believe one of the majors may be readying a takeover offer"; "If you believe, as I do"; "I expect this stock, **NORX**, to jump quickly"; "I believe the good old US of A will become the world's number one oil producing country"; and "I checked the numbers three times to make sure they were right.  And it's true."  (E.g., Tenreiro Decl. 2, Ex. 21, at 3, Ex. 25, at 6, Ex. 31, at 1–6; Def. Ex. 2, at 1, 12–13).  The direct-mail promotions also bear a bolded

7

image of Dany's signature.  (Def. Ex. 2, at 3.)  Dany's contracts buttress the fact that he elected to participate in the campaign.  And Dany has not submitted evidence suggesting that he did not want the statements in the promotions to be attributed to him.  The Supreme Court has deemed such attribution to be "strong evidence" indicating that Dany "made" the alleged misstatements.  See Janus, 564 U.S. at 142–43.

E-mail exchanges among the participants in the Norstra campaign also reveal that Kaitz conferred on Dany the "authority" to manage the "content" of the materials and "whether and how to communicate it."  See Janus, 564 U.S. at 142.  In one e-mail chain, Dany asks Weintz to correct certain factual inaccuracies, while in the next e-mail, Kaitz bemoans the fact that Dany had already "approved" it.  (Tenreiro Decl. 2, Ex. 29.)  In another e-mail chain, Weintz cautions Kaitz that his draft "does not have [Dany's] approval" and anticipates further input from Dany.  (Tenreiro Decl. 2, Ex. 13).  Dany then responds with "suggested revisions." (Tenreiro Decl. 2, Ex. 30.)  In another e-mail chain, Kaitz, Dany, and his agent Kevin Finn discuss certain non-negotiable terms that Dany intended to enforce for the campaign, such as refusing to include an "insert" in The Wall Street Journal.  (Tenreiro Decl. 2, Exs. 27–28.)  Finally, yet another e-mail shows Kaitz forwarding to Dany what purports to be a final version of the Norstra printer proof, asking "[D]id you approve this yet, I would like to go to print today." (Tenreiro Decl. 2, Ex 19.)  Dany responds with his approval.  (Tenreiro Decl. 2, Ex. 18.)

Dany protests that he penned but a small portion of the text in the promotional materials, and was largely making minor content edits.  (SEC 56.1 Opp. ¶¶ 37–38.)  But such evidence would, at most, create a factual dispute to be resolved by a jury.  See S.E.C. v. Daifotis, 874 F. Supp. 2d 870, 877 (N.D. Cal. 2012) ("Attribution is enough to go to the jury.  The

8

carefully constructed responses in defendant's deposition testimony are not inconsistent with the subject quote having been shown to defendant and [] having been approved for publication on the website. . . . A jury will have to decide."). And Dany's additional objection that the promotions included a disclaimer does not alter the identity of the party making the "disclaimed" statements. Accordingly, Dany's motion for summary judgment that he is not the "maker" of the alleged misstatements is denied.

II.   "In Connection With" the Purchase or Sale of a Security

To violate Rule 10b–5, the alleged misstatements must have been made "in connection with the purchase or sale of any security." S.E.C. v. Zandford, 535 U.S. 813, 819 (2002) (quoting 17 C.F.R. § 240.10b–5). Statements made "in connection with" the purchase or sale of a security encompass include any "device employed, whatever it might be, [that is] of a sort that would cause reasonable investors to rely thereon, and, in connection therewith . . . cause them to purchase or sell a corporation's securities." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2d Cir. 1968).

A statement can be made "in connection with" the purchase or sale of a security even if the violator does not actually own the securities or engage in the relevant securities transactions. Texas Gulf Sulphur, 401 F.2d at 860–61. Rather, "Rule 10b–5 is violated whenever assertions are made . . . in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media." Texas Gulf Sulphur, 401 F.2d at 861–62. Courts have concluded that when misleading promotional materials are designed to ramp up stock purchases, the misleading statements therein are made "in connection with" the sale of the securities they tout. See SEC v. Pirate Investor LLC, 580 F.3d 233, 244 (4th Cir. 2009); cf. SEC

9

v. Corp. Relations Grp., Inc., No. 99-cv-1222, 2003 WL 25570113, at *9 (M.D. Fla. Mar. 28, 2003) (same, but defendants acquired the stock before it was promoted); SEC v. Blavin, 557 F. Supp. 1304, 1310–11 (E.D. Mich. 1983) (same).  While stock-picking newsletters can be harmless if the information in them is true, they may fall afoul of Rule 10b–5 when the information is false.

In Pirate Investor, the Fourth Circuit thoroughly analyzed the 10b–5 liability of a promotional campaign conducted by the eponymous stock-picking newsletter.  Pirate Investor learned that USEC, Inc.—a privatized governmental entity providing uranium-enrichment services—had requested that new uranium prices be discussed at a May 2002 presidential summit.  Pirate Investor, 580 F.3d at 237.  Pirate Investor interviewed USEC's CEO about a potential pricing agreement, then offered to sell subscribers a report for $1,000 that would identify a company whose stock would benefit from a "major international agreement" with the Russian Federation on May 22.  Pirate Investor, 580 F.3d at 238.  The record suggested that Pirate Investor did not actually know when the agreement would be revealed; and no agreement was announced until June 19.  Pirate Investor, 580 F.3d at 239.  Pirate Investor appealed a judgment against it in the SEC enforcement action, arguing that any misstatements related only to Pirate Investor's attempts to sell the USEC report; not to any decision by purchasers of the report about whether to buy USEC stock.  See Pirate Investor, 580 F.3d at 245.

The Fourth Circuit proposed several "no[n] mandatory" factors that courts might use to "guid[e] the inquiry" of whether misstatements were made in connection with the purchase or sale of securities: (1) whether the sales were "necessary" to the scheme; (2) whether the parties' relationship "necessarily" involved trades; (3) whether defendants "intended" to

induce trades; and (4) whether material misrepresentations were disseminated through a medium on which investors might reasonably rely.  See Pirate Investor, 580 F.3d at 244.

        The Fourth Circuit conceded that Pirate Investor had no "trading relationship" with its subscribers because it was only providing investment advice, and that some investors may have "taken one look at" the ads and then "marked [them] for the SPAM box."  Pirate Investor, 580 F.3d at 247, 251.  Nonetheless, the Court of Appeals found that the evidence demonstrated that the USEC campaign was conducted "in connection with" the purchase or sale of USEC securities.  Pirate Investor, 580 F.3d at 252.  For one, the obvious purpose of the campaign was to cause investors to buy USEC stock based on false information, which further increased the campaign's credibility as the stock went up.  Pirate Investor, 580 F.3d at 247–48.  Moreover, while some users may have deleted the e-mails without a thought, the campaign was targeted at persons on Pirate Investor's mailing lists—the very people likely to rely on Internet-based stock-picking advice.  Pirate Investor, 580 F.3d at 251.

        Dany argues that the promotions were so over-the-top that they would not cause any "reasonable investor" to purchase Norstra securities.  (Def.'s Opp. to PMSJ, ECF No. 72, at 8.)  As in Pirate Investor, however, the promotions were not targeted at sophisticated, institutional investors—they were targeted at investors who might well rely on the prospect of spectacular gains, particularly when the recommendation came from Dany.  Indeed, the mailing lists Kaitz used included, among others, subscribers' to Dany's newsletters.

        The obvious purpose of these promotions was to cause investors to purchase Norstra securities.  Indeed, the promotions say as much: "Buy shares of Norstra Energy (NORX) now"; "invest"; "BUY NOW!" (See, e.g., Tenreiro Decl. 2, Ex. 31, at 3–4, 11.)  At their

11

depositions, Dany, Kaitz, and Weintz all agreed that the purpose of the mailings was to increase interest in Norstra's stock. (Dany 56.1 Opp. ¶¶ 16–21.) And while Dany may have had other motivations for participating (such as being paid, or obtaining more subscribers), a misstatement is "in connection with" the purchase or sale of securities "irrespective of whether" the speaker has an "ulterior purpose or purposes" in delivering the misstatement. See Texas Gulf Sulphur, 401 F.2d at 861. The notion that this campaign was not intended to make investors purchase Norstra stock defies common sense. See, e.g., Pirate Investor, 580 F.3d at 251 ("Appellants certainly should not have been shocked" to learn that their stock promotions "induced securities transaction[s].").

### III. Jurisdictional Element of Interstate Commerce

The SEC also argues that there is no dispute of material fact that the jurisdictional element of interstate commerce has been satisfied. Exchange Act "Rule 10b–5 . . . includes three subsections." SEC v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 285 (2d Cir. 2013). In this action, the SEC asserts that Dany violated the second subsection—Rule 10b-5(b)—which makes it unlawful "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact." Rule 10b–5(b), 17 C.F.R. § 240.10b–5(b); (Compl. ¶¶ 54–58.).[3] Inherently interstate methods of communication, such as the Internet or e-mail,

---

[3] At this Court's request, the SEC submitted a supplemental letter regarding the scope of Rule 10b–5(b)'s jurisdictional element. (See ECF No. 85.) The plain language of Rule 10b–5(b), unlike subsections (a) and (b), "seems to contemplate that the communication will be made through the use of the jurisdictional means." THOMAS L. HAZEN, 6 LAW OF SECURITIES REGULATION § 17:13. However, there is seemingly a dispute as to whether Rule 10b–5(b) may be satisfied even when the defendant has simply "used some means of interstate communication . . . in some phase of the transaction." SEC v. Stanard, No. 06-cv-7736, 2009 WL 196023, at

constitute "instrumentalities" of interstate commerce.  See S.E.C. v. Straub, 921 F. Supp. 2d 244, 262 (S.D.N.Y. 2013) (FCPA enforcement action) (citing SEC v. Solucorp Indus. Ltd., 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003) (enforcement action under '33 Act § 17(a) and '34 Act § 10(b)).

There is no dispute of material fact that the alleged misstatements were transmitted by mail, e-mail, and over the Internet.  Dany's contracts provided that the Norstra campaign would be distributed to U.S. investors by these means.  (See Tenreiro Decl. 1, Exs. 6, 7.)  Dany's suggestion that the promotions were paid for, created, and then never distributed is belied by the testimony.  (See Def. Ex. A, Sept. 23, 2013 Eric Dany Deposition ("Dany Dep. 1"), at 46:20–25 ("[MR. DANY]: For Norstra, yes, the Norstra megalog.  I know that . . . it was distributed by e-mail . . . and I know that it was distributed by direct mail . . . .")).  Dany received inquiries from—and responded to—subscribers who complained about getting the promotional materials.  (See, e.g., July 20, 2016 Reply Declaration of Jorge G. Tenreiro ("Tenreiro Decl. 3"), Ex. 3 (e-mail from Dany reporting that recipients of promotion were being "spammed"); Ex. 4 (e-mail from Dany responding to subscriber inquiring "Why is this company NOT in your portfolio[?]")).  Moreover, Kaitz confirmed that "anywhere between one and a half and two and a half million pieces of mail" were sent out.  (Def. Ex. B, Apr. 6, 2016 William Kaitz Deposition ("Kaitz Dep."), at 269:7–271:19.)  Accordingly, the SEC's motion for partial summary judgment on Rule 10b–5(b)'s jurisdictional element is granted.

---

*25 (S.D.N.Y. Jan. 27, 2009) (citing Richter v. Achs, 962 F. Supp. 31, 33 (S.D.N.Y. 1997)); see also HAZEN, 6 LAW OF SECURITIES REGULATION § 17:13 (reading the subsections of Rule 10b–5 together, "[i]t appears to be the majority rule" that there need only be a "connection between the use of the jurisdictional means and the fraud").  In this action, the evidence is nonetheless clear that the alleged misstatements were communicated through interstate means or instrumentalities.

## CONCLUSION

Eric Dany's motion for summary judgment is denied. The SEC's motion for partial summary judgment is granted. The Clerk of Court is directed to close the motions pending at ECF Nos. 61 and 65.

Dated: August 17, 2016
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.